## BALTIMORE & OHIO RAILROAD COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 305. Argued March 12, 1923.—Decided April 9, 1923.

1. The Dent Act, c. 94, 40 Stat. 1272, was intended to remedy irregularities and informalities in the mode of entering into the agreements to which it relates; not to enlarge the authority of the agents by whom they were made. P. 596.
2. The "implied agreement" contemplated by this act is not an agreement "implied in law," or *quasi* contract, but an agreement "implied in fact," founded on a meeting of minds inferred, as a fact, from conduct of the parties in the light of surrounding circumstances. P. 597.

3. Findings of fact showing that the claimant railway company constructed temporary barracks for troops, who were guarding its property as well as that of the Government, and undertook this without any order from their commanding officer, but voluntarily and without mentioning compensation, apparently from its own desire to provide for the comfort of the troops—*held* an insufficient basis for implying an agreement that the Government would pay the cost of construction. P. 599.

57 Ct. Clms. 140, affirmed.

APPEAL from a judgment of the Court of Claims dismissing the petition, after a hearing upon the merits, in an action to recover compensation under the Dent Act.

*Mr. John F. McCarron,* with whom *Mr. George E. Hamilton* was on the brief, for appellant.

*Mr. Solicitor General Beck* and *Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, appeared for the United States.

MR. JUSTICE SANFORD delivered the opinion of the Court.

The Railway Company filed its petition, under the Dent Act (March 2, 1919, c. 94, 40 Stat. 1272), to recover compensation for constructing temporary barracks for the use of United States troops under an " implied agreement " alleged to have been entered into by it with the United States, in December, 1917, through Col. Kimball, Expeditionary Quartermaster of the War Department, at Locust Point, Baltimore, Maryland, acting under the authority of the Secretary of War. The Court of Claims, after a hearing on the merits, and upon its findings of fact, dismissed the petition. 57 Ct. Clms. 140.

The material facts shown by the findings are these: The Railroad Company owned at Locust Point, a suburb of Baltimore, eight piers, which were guarded by its civilian employees. At the request of Col. Kimball, who was

in charge of the expeditionary depot at Baltimore and of
the supplies arriving for shipment to Europe, the com-
pany, in October, 1917, leased one of these piers to the
Government. Two of the other piers with much other
property belonging to the company were destroyed or
damaged by a fire supposed to be of incendiary origin.
Thereupon Col. Kimball and the president of the com-
pany separately requested the Secretary of War to send
a guard; the vice president of the company offering to
supply a wrecking train as quarters for them. Two com-
panies of the National Guard were sent to Locust Point,
with sufficient tentage. They were quartered for a time
in the wrecking train furnished by the company. Their
duty was primarily to protect the government property
and the piers leased by it, sending patrols throughout the
railroad yard to guard cars containing its property, and
generally to guard all the piers and property at Locust
Point. The company, however, also maintained the
civilian guards and a fire department for all of its prop-
erty, whether leased or not. Later, the wrecking train
having been moved away by the company, the troops
moved into tents. The weather during the fall and win-
ter was very cold and inclement. Most of the soldiers
were Baltimoreans and were frequently visited by their
relatives. There was some sickness among them. Their
relatives complained to the railroad officials of the hard-
ships they had to undergo in the tents; and these officials
were anxious to make them as comfortable as possible.
Several times in very cold weather Col. Kimball remarked
to the company's agent at Locust Point, whose duty it
was to confer with him on railroad matters, that the
troops ought to have better quarters. On one occasion
this agent suggested fitting up an unused transfer shed
belonging to the company, standing near the pier that
had been leased to the Government. Col. Kimball agreed
that it woul be a fine thing to make the men as com-

fortable as possible.   He did not, however, ask that this work be done; and nothing was said about compensation. This agent having taken up with the company's officials the matter of fitting up the transfer shed, its chief engineering draftsman was directed to see as to the adaptability of the transfer shed for barracks.   He made blue print plans for remodeling the shed; which he showed to the officer in command of the troops, to learn whether, in his opinion, they would satisfactorily house the troops. This officer, while not undertaking to approve the plans, suggested the amount of facilities that would be required. Nothing was said to him, however, about expense or compensation for the work.   The construction of the temporary barracks was completed in the latter part of December; and the troops moved in.   Two more piers were afterwards leased by the company to the Government.   The barracks were occupied by the troops until May, 1919; and the piers were returned to the company in June, 1919.   No government officials connected with the work at Locust Point had any authority to order the construction of the temporary barracks; and no orders were given by any of them for such construction.   The subject of compensation was not mentioned in any conversations between these officers and the railroad officials until more than a week after the barracks had been completed, when the chief draftsman told the officer in command of the troops that he thought the Government should reimburse him for some of his trouble.

The Court of Claims made no finding as to the amount expended by the company in constructing the temporary barracks; the company having, as the court stated, submitted no evidence to establish the different items of its claim.   In the absence of a finding as to the amount of the expenditures, as to which the company had the burden of proof, the judgment of the Court of Claims might be properly affirmed upon that ground.   *Crocker* v. *United*

*States,* 240 U. S. 74, 82. However, as the Government does not here question the amount of the claim, we pass to its further consideration upon the merits.

Upon the findings of fact we conclude that the petition was rightly dismissed, without reference to the amount of the claim, for two reasons:

1. The Dent Act authorizes the award of compensation for expenditures connected with the prosecution of the war when they were made by the claimant upon the faith of an " agreement, express or implied," entered into by him with an officer or agent acting under the authority of the Secretary of War or of the President, and such agreement was not executed in the manner provided by law. 40 Stat. 1272, 1273; *American Smelting & Refining Co.* v. *United States,* 259 U. S. 75, 79. The act was intended to remedy irregularities and informalities in the mode of entering into such agreements; not to enlarge the authority of the agents by whom they were made. To entitle the claimant to compensation under such an agreement it is essential that the officer or agent with whom it was entered into should not merely have been holding under the Secretary of War or the President, but that he should have been acting within the scope of his authority. It was not intended, for example, that an officer in one branch of the military service or one of inferior rank could bind the Government by an agreement as to matters relating to an entirely different branch of the service or within the control of his superior officers, as to which he had no authority whatever; or that an agreement into which he entered, although beyond his authority, should become binding upon the Government because it was made in the form of an express agreement not executed within the legal manner or of an implied agreement merely—that is, that his authority should be enlarged by the irregularity or informality with which it was exercised. See *United States* v. *North American Transportation &*

*Trading Co.*, 253 U. S. 330, 333; and *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 260 U. S. 327.

Here, however, there is no finding that Col. Kimball had any authority to enter into the alleged agreement; and, on the contrary, such authority is negatived by the finding that none of the government officials connected with the work at Locust Point had any authority to order the construction of a temporary barracks.

Hence an essential element in the establishment of the company's claim is lacking.

2. The " implied agreement " contemplated by the Dent Act as the basis of compensation, is not an agreement " implied in law," more aptly termed a constructive or *quasi* contract, where, by fiction of law, a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress, but an agreement " implied in fact," founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. See, by analogy, as to the construction of similar jurisdictional statutes, *United States* v. *Berdan Fire-Arms Mfg. Co.*, 156 U. S. 552, 566; *Russell* v. *United States*, 182 U. S. 516, 530; *Harley* v. *United States*, 198 U. S. 229, 234; *United States* v. *Anciens Etablissements*, 224 U. S. 309, 311, 320; *United States* v. *Buffalo Pitts Co.*, 234 U. S. 228, 232; *Tempel* v. *United States*, 248 U. S. 121, 129; and *Sutton* v. *United States*, 256 U. S. 575, 581; and, generally, *Railway Co.* v. *Gaffney*, 65 Ohio St. 104, 113; *Woods* v. *Ayres*, 39 Mich. 345, 350; *Hertzog* v. *Hertzog*, 29 Pa. St. 465, 468; *Knapp* v. *United States*, 46 Ct. Clms. 601, 643; and 1 Bouv. Dict. (Rawle's 3d Rev.) 660. That this provision of the Dent Act relates only to such actual agreements, implied in fact from the circumstances, is not only indicated by its purpose, as expressed in the caption, of providing relief in cases of " contracts " connected

with the prosecution of the war, but is conclusively shown by the fact that the " agreement " is described as one " *entered into,* in good faith," by the claimant, with an officer or agent of the Government, upon the faith of which expenditures have been made or obligations incurred, and which has not been executed as prescribed by law; this language aptly describing an actual agreement implied in fact, but being manifestly inapplicable to a constructive agreement implied in law.

Such an agreement will not be implied unless the meeting of minds was indicated by some intelligible conduct, act or sign. *Woods* v. *Ayres, supra,* p. 351; and cases there cited. And so an agreement to pay for services rendered by the plaintiff will not be implied when they were rendered spontaneously, without request, as an act of kindness (*Woods* v. *Ayres, supra,* p. 351); when the plaintiff did not expect payment, or under the circumstances did not have reason to entertain such expectation (*Coleman* v. *United States,* 152 U. S. 96, 99; *Lafontain* v. *Hayhurst,* 89 Maine, 388, 391); when the defendant understood that the plaintiff would neither expect nor demand remuneration (*Harley* v. *United States,* supra, p. 235); when unusual expenses were incurred, without special request or previous notice, and without any intimation or suggestion that compensation would be looked for or made (*Baltimore & Ohio R. R. Co.* v. *United States, ante,* 385); when the defendant neither requested the services nor assented to receiving their benefit under circumstances negativing any presumption that they would be gratuitous (*Railway Co.* v. *Gaffney, supra,* p. 116; 2 Abb. Tr. Ev., 3d ed., 912, and cases there cited); [1] and

[1] But an agreement to compensate the plaintiff for the use of his property will be implied when it was used by the defendant without claim of right, and the plaintiff consented to such use with the expectation of receiving compensation. *United States* v. *Palmer,* 128 U. S. 262, 269; *United States* v. *Berdan Fire-Arms Mfg. Co.,* 156

when the circumstances account for the transaction on a ground more probable than that of a promise of recompense (*Woods* v. *Ayres, supra,* p. 351.)[2]

In the present case the findings of fact show that Col. Kimball did not order the construction of the barracks; which was voluntarily undertaken by the company, without saying anything whatever about compensation, apparently from its own desire to provide for the comfort of the troops, who were guarding its property as well as that of the Government, after it had removed the wrecking train which it had offered to supply as their quarters. It does not appear from the findings that Col. Kimball requested the construction of the barracks; that the company intimated that it would expect payment from the Government or that Col. Kimball suggested that such payment would be made; or that the company in fact expected compensation. It is clear that these findings furnish no substantial basis for implying an agreement that the Government would pay the cost of the construction.

Hence, a second essential element in the establishment of the company's claim is lacking.

And the judgment of the Court of Claims is

*Affirmed.*

---

U. S. 552, 567; *United States* v. *Anciens Etablissements, supra,* p. 320. And see, as to the implied agreement to pay for property appropriated by legislative authority for a public use, without condemnation proceedings, *United States* v. *North American Transportation & Trading Co.,* 253 U. S. 330, and cases there cited.

[2] As to the character of evidence by which an implied agreement to pay for services is generally established, see 2 Abb. Tr. Ev. 913, and cases there cited.