**HATZLACHH SUPPLY COMPANY, INC.**

v.

**UNITED STATES and Sea-Land Service, Inc.**

No. 120–76.

United States Claims Court.

April 18, 1985.

---

744

Nathan Lewin, Washington, D.C., for plaintiff. Mark Landesman, New York City, of counsel.

George M. Beasley, III, Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard, and Francis J. Sailer, Washington, D.C., for defendant. Steven L. Basha, Washington, D.C., of counsel.

Michael D. Wilson, New York City, for third-party defendant.

## OPINION

WOOD, Judge.

In this action, before the court for decision on the merits following trial, plaintiff, a corporation engaged in 1970 in the business of importing photographic supplies, razor blades, electric shavers, and electronic goods, contends in substance that the seizure, pursuant to 19 U.S.C. § 1592 (1970)[1], of two separate shipments of imported goods for suspected violations of Customs laws[2], followed by advice that the forfeitures incurred would be remitted upon stated conditions, gave rise, upon plaintiff's compliance therewith, to an implied in fact contract of bailment that defendant would preserve and return to plaintiff *all* of the merchandise seized. Plaintiff further asserts a breach of that implied in fact contract, and a right to damages.

Defendant denies any liability, asserting that the lawful seizures of plaintiff's goods for suspected violations of Customs laws, and their subsequent retention by the Customs Service pending resolution of the forfeitures incurred, whether considered separately or in conjunction with the subsequent decision, pursuant to 19 U.S.C. § 1618, to remit the forfeitures incurred, are insufficient to create any implied in fact agreement to preserve and redeliver whole the seized merchandise.[3]

For the reasons, and under the authorities, appearing below, it is concluded that plaintiff has proven no claim properly within the jurisdiction of this court, and that its complaint must therefore be dismissed.

### I

The case has had a long and tortuous history. Notwithstanding, the basic facts upon which the existence *vel non* of an implied in fact contract depends are, as plaintiff urges, relatively simple and straightforward.[4]

The two separate and lawful seizures which ultimately led to this litigation occurred in March and April 1970, respectively. By letters, dated May 28 and June 3, 1970, plaintiff was formally notified that the goods here involved had been seized under the provisions of section 1592, and its attention was invited to the provisions of section 1618. Both letters indicated that plaintiff might "file a petition for relief from the forfeiture incurred" pursuant to the latter section, and, by letters dated June 5 and June 26, 1970, plaintiff did so.[5]

Because the value of the seized merchandise exceeded the amount the Customs Service had authority to consider under section

---

1. Unless otherwise indicated, all statutory citations in this opinion are to the provisions of law in effect throughout 1970.

2. Plaintiff's goods were "seized * * * and declared forfeited for customs violations." *Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 461, 100 S.Ct. 647, 648, 62 L.Ed.2d 614 (1980). Plaintiff does not, and could not successfully, dispute the legality of the seizures.

3. Defendant and third-party defendant, Sea-Land Service, Inc., also challenge plaintiff's proof of breach and damages. Defendant contends (*inter alia*) that plaintiff has failed to establish either that all of the seized goods were not returned or that any loss occurred while the goods were in the possession of the Customs Service. Among other things, Sea-Land asserts that plaintiff has failed to prove "the *fact* of his loss, *i.e.,* that any monies were paid to the suppliers of the cargo allegedly pilfered" (emphasis not supplied). Sea-Land also contends that any pilferage from the second shipment seized occurred after the containers in which that shipment was landed left Sea-Land's terminal.

4. This is not to say, however, that plaintiff's view of just what the basic facts are is accurate.

5. Plaintiff's June 5, 1970, letter requested "relief from the forfeiture declared by your office in your seizure and penalty notice dated May 28, 1970 * * *." The June 26, 1970, letter requested "cancellation of the forfeiture incurred as a result of the [April 3, 1970] seizure * * *."

1618, the petitions were duly forwarded to the Assistant Secretary (Enforcement), Department of the Treasury, who had authority to remit or mitigate under section 1618, and who was the proper deciding official on plaintiff's petitions for relief. By letter, dated October 6, 1970, the Assistant Secretary advised the Regional Commissioner of Customs, New York, New York, in part as follows:

> The forfeitures are remitted upon the payment of $40,000 plus expenses, if any, and the filing of appropriate entries, paying any duties applicable, and complying with all requirements, including marking. Should the reported pilferage be determined to be the responsibility of Customs, the Department will reconsider the matter and make appropriate adjustment upon the filing of a supplemental petition.

The Assistant Secretary asked the Regional Commissioner to inform plaintiff of the foregoing, and, by letter dated October 13, 1970, the Regional Commissioner did so.[6] The October 13, 1970, letter included the language just quoted verbatim.[7] Plaintiff made the prescribed payment and met the additional conditions stated, and in late October 1970, all of the seized merchandise then in the possession of the Customs Service was released to plaintiff.

It is reasonable to infer from the record that, between the dates of the seizures and the filing of plaintiff's section 1618 petitions for relief from the forfeitures incurred, the Customs Service expected that plaintiff would seek relief under section 1618, and that, if so, some remission or mitigation might well result[8]. The grant of any clemency to plaintiff under section 1618 was, however, not within the authority of the Customs Service, in the circumstances of this case, and the nature and extent of any such clemency, if granted, was obviously not clear to either plaintiff or the Customs Service prior to the Assistant Secretary's decision.

In March 1976, plaintiff filed an action in the United States Court of Claims.[9] Plaintiff alluded to the 1970 seizures, and alleged that goods of the value of $165,-220.50 had been " 'pilfered' or 'stolen' while the forfeited material was in the possession of the defendant." *Hatzlachh Supply Co. v. United States*, 579 F.2d 617, 618, 217 Ct.Cl. 423 (1978). Its complaint alleged a breach of an implied contract of bailment, as well as an "unreasonable detainer of

---

6. Because remission of the forfeitures incurred was sought, and granted, condemnation, or forfeiture by court decree, was not pursued. See 19 CFR §§ 23.11, 23.21, 23.23, and 23.24 (1970).

7. Both of plaintiff's section 1618 petitions had complained of pilferage. Plaintiff's June 5, 1970, petition stated that the "quantities which survived the opening of the container in a public place accessible to strangers on the pier * * *" were less than the amounts invoiced, and its June 26, 1970, petition flatly charged that "a substantial shortage of goods took place after the containers were unsealed on the pier and while in Customs custody." In the latter petition, plaintiff "hoped that the *remaining* merchandise will be made available * * * and the case cancelled." (emphasis supplied) In acting on plaintiff's petitions, the Assistant Secretary was aware that a portion of the first shipment, inventoried by a Customs inspector at Sea-Land's terminal in March 1970, had subsequently disappeared. His reference to an adjustment for pilferage related to the penalty payment of $40,000, not to the value of any missing merchandise. See n. 9, *infra*.

8. During the period here relevant, not all petitions for relief under section 1618 were granted. *Cf. United States v. Eight Thousand Eight Hundred And Fifty Dollars ($8,850) In United States Currency*, 461 U.S. 555, 558, 103 S.Ct. 2005, 2009, 76 L.Ed.2d 143 (1983). In some cases, a section 1618 petition was denied, and a judicial decree of forfeiture of goods seized under section 1592 was sought and obtained.

9. In June 1971, the Regional Commissioner had received from plaintiff supplemental petitions requesting remission of the $40,000 "penalties" paid to secure relief from forfeiture of the seized merchandise. The petitions were denied December 2, 1971. There is nothing in the record to indicate that, between October 1970 and June 1971, plaintiff complained that any goods were missing from the shipments seized in March and April 1970. The June 1971 petitions did allude to merchandise assertedly "lost" while the seizures were in effect.

plaintiff's property and deprivation without due process." *Ibid.*

Defendant thereupon moved for summary judgment. On July 14, 1978, the Court granted the motion and dismissed plaintiff's petition. With respect to plaintiff's second claim, the Court held the seizures were plainly not "illegal" but that, even if defendant's actions were so viewed, the second claim would sound in tort and therefore be beyond the Court's jurisdiction; the Court also held that no "taking" had occurred. *Hatzlachh Supply Co.*, 579 F.2d at 618–19.

With respect to plaintiff's first claim, the Court held that in enacting 28 U.S.C. § 2680(c) (1970), Congress had *"specifically precluded recovery* in claims arising from customs detentions, even where such claims arose from tortious actions by the government," and that it therefore could not hold that by "seizing subject to forfeiture certain merchandise, the Government *assented* to, or agreed to be bound by, an implied in fact contract to return the merchandise whole." *Hatzlachh Supply Co.*, 579 F.2d at 621 (emphasis not supplied). The Court concluded that plaintiff had failed to state either a claim based upon an implied in fact contract or any other claim of merit, and dismissed plaintiff's petition. *Id.* at 621–22.

In January 1980 the Supreme Court vacated the judgment of the Court of Claims and remanded the case for further proceedings. *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980). In doing so, the Supreme Court noted that the government "does not now defend the reasoning of the

Court of Claims that § 2680(c) forecloses a remedy on an implied-in-fact contract of bailment," and held that statutory provision to have no effect upon the Court's power to render judgment upon any claim against the United States founded upon any express or implied contract with the United States. *Id.*, 444 U.S. at 462–63, 465, 100 S.Ct. at 649.[10]

Following remand and vacation of its prior judgment[11] the Court of Claims again heard the case on cross-motions for summary judgment. By unpublished order, dated April 17, 1981, the Court denied both motions, without prejudice, and remanded the case to the Trial Division for further proceedings. Following transfer to this court pursuant to section 403(d), Federal Courts Improvement Act of 1982, Pub.L. 97–164, 96 Stat. 25, 58, 28 U.S.C. § 171 note (1982), the case has been tried and fully briefed, and is ready for decision.[12]

The record, as developed over a four-day trial, fails to demonstrate any government "promise, representation or statement that [plaintiff's] goods would be guarded or carefully handled" pending resolution of the forfeitures incurred with respect to the shipments seized for suspected violations of Customs laws. *Hatzlachh Supply Co.*, 579 F.2d at 621. Nor can it be found that the Customs Service, by transmitting to plaintiff in October 1970 the Assistant Secretary's earlier decision to remit the forfeitures incurred upon conditions stated, thereby agreed, impliedly or otherwise, retroactively to assume the duties of a bailee with respect to the goods seized, many months earlier, for suspected violations of Customs laws, or to accept any

---

10. The majority opinion "indicate[s] no view, one way or the other, as to whether an implied-in-fact contract could be found on the record in this case." 444 U.S. at 466, n. 6, 100 S.Ct. at 651, n. 6. Mr. Justice Blackmun, dissenting, was of the opinion that "an implied-in-fact contract is not to be found on the record in this case, and [that] the remand is, or should be, a useless exercise leading to an inevitable result." 444 U.S. at 467, 100 S.Ct. at 651.

11. See *Hillard v. United States*, 650 F.2d 285, 222 Ct.Cl. 670 (1980)

12. Third-party defendant Sea-Land Service, Inc. (to whom, on defendant's motion, a United States Court of Claims Rule 41(a) notice had been given in December 1976) sought unsuccessfully to quash the notice, then filed an answer herein. Sea-Land played no active role in the case during its pendency on dispositive motions before the Court of Claims, however, nor did it do so while the case was pending before the Supreme Court. Sea-Land has participated in post-1981 pre-trial proceedings, trial, and post-trial briefing.

**748**

financial responsibility for an inability to return the seized merchandise whole.[13]

In this connection, the record contains no proof that any New York Customs Region officer or employee who dealt with plaintiff or any of its representatives during the 1970–71 period had any contractual authority whatever to obligate defendant to compensate plaintiff for any goods lost or pilfered between the time those goods were seized and the Customs Service's October 13, 1970, advice to plaintiff of the Treasury Department's earlier decision to remit the forfeitures incurred, or otherwise to bind defendant to the implied in fact contract of bailment here alleged.

## II

■ This court has clear and unquestioned power to hear and render judgment upon any monetary claim against the United States founded upon an express or implied contract with the United States. That jurisdictional grant, however, extends only to claims arising out of express or implied in fact contracts; it does not encompass claims founded upon contracts "based merely on equitable considerations and implied in law." *United States v. Minnesota Mutual Investment Co.*, 271 U.S. 212, 217, 46 S.Ct. 501, 503, 70 L.Ed. 911 (1926); *Merritt v. United States*, 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Baltimore & O.R.R. v. United States*, 261 U.S. 592, 597–98, 43 S.Ct. 425, 426–27, 67 L.Ed. 816 (1923); *Fincke v. United States*, 675 F.2d 289, 295–97, 230 Ct.Cl. 233 (1982); and *see H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984).

To prove the existence of the implied in fact contract of bailment here asserted, plaintiff must show the same mutual intent to contract * * * as is required for an express contract. * * * Plaintiff must show an agreement based upon a meeting of the minds that can be inferred, as a fact, from the conduct of the parties under existing circumstances which manifests their tacit understanding.

*Prevado Village Partnership v. United States*, 3 Cl.Ct. 219, 223–24 (1983) (citations omitted); *see also H.F. Allen Orchards*, 749 F.2d at 1575; *Fincke*, 675 F.2d at 295.

Plaintiff asserts, in substance if not *in haec verba*, that when the Customs Service advised plaintiff, on October 13, 1970, of the Treasury Department's decision on plaintiff's section 1618 petitions for relief from the forfeitures incurred, the Customs Service "was promising to return goods that it had theretofore been holding as a temporary custodian" and that the "explicit promise to redeliver them" gave rise to an implied, and (apparently) a retroactively effective, "promise to 'use due care during the term of the bailment' " [14], to preserve and safeguard all of plaintiff's goods, and to return them whole to plaintiff upon its satisfaction of the Treasury Department's conditions for remission of forfeitures. That line of argument is not a valid one.

■ The two shipments here involved were lawfully and forcibly seized by the Customs Service "subject to forfeiture," and were thereafter held as of right pending resolution of the matter of the forfeitures incurred.[15] It was the Treasury De-

---

**13.** Plaintiff calls the Customs Service's October 13, 1970, letter the "focal point and culmination of the 'tacit understanding' " that defendant would act as a bailee with respect to the seized property, terms it a government promise to release all of the goods seized; and asserts that the promise was broken when plaintiff "received only a portion of its seized goods * * *." Long before that date however, plaintiff, the Customs Service and the Assistant Secretary were all aware that some of the merchandise seized had long since disappeared. Plaintiff's assertion that, notwithstanding, the parties in fact intended to and did contract for the return

to plaintiff of *all* of the seized goods is unsupported by the Assistant Secretary's decision, the Customs Service's letter, or the record.

**14.** Plaintiff's quotation is from *Alliance Assurance Co. v. United States*, 252 F.2d 529, 532 (2d Cir.1958). As will be seen, the holdings in that case are of no comfort to plaintiff here.

**15.** In 1970, seizures by Customs officers were authorized upon "reasonable cause to believe that a violation * * * of any law, the enforcement of which is within the jurisdiction of the Customs Service, by reason of which any prop-

partment's decision, under section 1618, to remit the forfeitures incurred with respect to such goods upon conditions stated, and as a matter of grace [16], not the termination of any implied in fact contract of bailment, that led to the redelivery to plaintiff of *any* of the merchandise earlier seized. *Walker v. United States*, 438 F.Supp. 251 (S.D.Ga. 1977); *Hatzlachh Supply Co.*, 444 U.S. at 467, 100 S.Ct. at 651 (Blackmun, J. dissenting); *cf. United States v. Eight Thousand Eight Hundred And Fifty Dollars ($8,850) In United States Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983); *A & D International, Inc. v. United States*, 665 F.2d 669, 673 (5th Cir.1982); *Malnak v. United States*, 223 Ct.Cl. 783, 786 (1980).

■ Defendant vigorously urges that under section 1592 the acts of seizure, in and of themselves, effected a transfer of legal title to the goods to the United States as of the date of seizure. That position is of doubtful validity. *Cf. United States v. Stowell*, 133 U.S. 1, 16–17, 10 S.Ct. 244, 247, 33 L.Ed. 555 (1890); *Caldwell v. United States*, 49 U.S. (8 How.) 366, 381, 12 L.Ed. 1115 (1850). That conclusion, however, does not really aid plaintiff's cause. At the very least, defendant's seizure of the goods gave it an unperfected "right to title, subject only to judicial determination"; in the circumstances "no bailment could be created by the seizure of the * * * [goods]." *Walker*, 438 F.Supp. at 258. The relationship that existed between plaintiff and defendant with respect to the goods during the resolution of the matter of the forfeitures incurred has not been shown to rest on any "mutuality of intent to contract, offer, and acceptance * * *." *H.F. Allen Orchards*, 749 F.2d at 1575.

■ At the time of the seizures, the Customs Service undoubtedly anticipated that plaintiff might seek relief under sec-

tion 1618 from the forfeitures incurred, and that such efforts, if made, might well lead to some remission or mitigation.[17] The nature and extent of any clemency plaintiff might receive under section 1618, however, was neither clear nor, indeed, within the power of the Customs Service to grant. In the meantime, defendant's claim of right to the goods seized, subject to perfection by condemnation, persisted. In such circumstances, an implied in fact contract of bailment premised on either the possibility or the fact of remission simply cannot be found to exist. *Walker*, 438 F.Supp. at 258–59; *H.F. Allen Orchards*, 749 F.2d at 1575; *Schmalz v. United States*, 4 Ct.Cl. 142, 147 (1868); 8 Am.Jur.2d *Bailments* §§ 63, 64. *Cf. Lionberger v. United States*, 371 F.2d 831, 840, 178 Ct.Cl. 151, *cert. denied*, 389 U.S. 844, 88 S.Ct. 91, 19 L.Ed.2d 110 (1967); *Maulding v. United States*, 17 Alaska 592, 257 F.2d 56, 60 (9th Cir.1953). No "tacit understanding," at the times of the seizures or thereafter, that defendant would hold the seized goods as a bailee, in trust, under an agreement that all of that merchandise wuld be safeguarded, preserved, and returned to plaintiff free from any diminution or loss whatsoever, has been established or can be found. *Fincke*, 675 F.2d at 295; see also *Walker*, 438 F.Supp. at 258–59; *H.S. Crocker Co. v. McFaddin*, 148 Cal.App.2d 639, 644, 307 P.2d 429, 433 (1957).

In slightly different terms, defendant's forcible and unilateral acts of seizing the goods and declaring them forfeited for violations of customs law may well not have "defined and consummated" the right and title of the government to those goods as of the times of the seizures, *Ivers v. United States*, 581 F.2d 1362, 1367 (9th Cir. 1978), but the "existing circumstances" nonetheless clearly negated any notion of a

---

erty has become subject to forfeiture * * *," had been committed. 19 CFR § 23.11 (1970).

**16.** The remission of the forfeitures incurred under Customs laws was a matter of mercy, to mitigate the severity of the law, not a matter of any right. *Dorsheimer v. United States*, 74 U.S. (7 Wall.) 166, 175, 19 L.Ed. 187 (1868).

**17.** As noted hereinabove, however, not all such petitions were granted. *Cf. United States v. Eight Thousand Eight Hundred And Fifty Dollars ($8,850) In United States Currency*, 461 U.S. 555, 558, 103 S.Ct. 2005, 2009, 76 L.Ed.2d 143 (1983).

"tacit understanding" to an implied in fact contract of bailment with respect to those seized goods. *Prevado Village Partnership*, 3 Cl.Ct. at 224. *See also Walker*, 438 F.Supp. at 258; *Schmalz v. United States*, 4 Ct.Cl. 142, 147 (1868). And, the relationship thus created was not transformed into one founded upon an implied in fact contract of bailment merely by the government's subsequent decision, pursuant to statute, and in its sole discretion, to remit the forfeitures incurred. Plaintiff can point to no "promise, representation or statement that the goods would be guarded or carefully handled," *Hatzlachh Supply Co.*, 579 F.2d at 621, and its assertions that an explicit decision to remit somehow evidenced defendant's agreement to be bound by an implied in fact contract to return the seized goods whole are entirely unpersuasive.

Plaintiff's strong reliance on *Alliance Assurance Co. v. United States*, 252 F.2d 529 (2d Cir.1958) is misplaced. In that case, the Customs Service took woolen goods to a government warehouse for inspection. After the goods passed inspection, the Customs Service furnished to the importer a delivery order consisting of two tickets. The importer (or its trucking company) sought to pick up the woolen goods toward the end of the working day, surrendering one of the tickets to Customs officials to obtain delivery of them. Because of the lateness of the hour, the Customs officials refused to release the goods that day. Notice to send the goods to the delivery platform for delivery to the consignee was, however, given. The next day, the goods could not be located, and they were never found thereafter.

One claim before the Court of Appeals in *Alliance* was that a breach of an implied in fact contract of bailment had occurred.[18] The Court of Appeals agreed, holding that the Customs Service had impliedly promised to return the goods to the lawful owner following completion of the customs inspection, as evidenced by the Customs Service's post-inspection issuance of an "elaborate set" of documents, at least two of which were explicitly "designed to restore the goods to the owner * * *." *Alliance*, 252 F.2d at 532. Defendant urges that in *Alliance* the Court of Appeals erred in finding Tucker Act contract jurisdiction. It is unnecessary to reach that argument. All else aside, *Alliance* is so sharply distinguishable as to be of no help to plaintiff.

■ On the facts of *this* case and the law, a retroactive agreement to preserve and safeguard plaintiff's goods throughout the period of the seizures, and a further undertaking to return all of the merchandise seized, intact and free from any loss or damage, if plaintiff met the Treasury Department's conditions, are not to be inferred from the conduct of the parties. Indeed, when the Treasury Department's decision that "the forfeitures are remitted upon the payment of $40,000 * * *" (and compliance with other conditions stated) was communicated to plaintiff, both plaintiff and defendant were well aware that some damage to the merchandise seized six or more months earlier had already occurred. In these circumstances, to infer a "tacit understanding" between the parties that defendant would return the seized merchandise whole (or indemnify plaintiff for any loss) would manifestly be inappropriate.

While plaintiff strenuously contends that defendant "voluntarily undertook a bailment" of plaintiff's merchandise, impliedly promised to "use due care" to preserve and safeguard that merchandise "during the term of the bailment," and subsequently promised "to return possession [of all the merchandise seized and declared forfeited] to" plaintiff, plaintiff ignores, or fails to recognize, what really happened. No such relationship, obligation, or promise was formed, undertaken, or given. The record, fairly construed, fails to establish that an

---

18. The Court of Appeals also held that 28 U.S.C. § 2680(c) (1958) did not bar a claim against the United States for the negligent loss of the goods under the Federal Tort Claims Act. *Alliance*, 252 F.2d at 533–34. That holding has now been squarely and authoritatively repudiated. *Kosak v. United States*, —— U.S. ——, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984).

implied in fact agreement in any of these areas was ever reached. And, " * * * the negligent performance of a noncontractual duty cannot be the basis of a breach of contract claim." *H.F. Allen Orchards,* 749 F.2d at 1576.

█ Nor, for that matter, can it be found that any person "whose conduct is relied upon had actual authority to bind the government in contract," as plaintiff alleges defendant was here bound to preserve, safeguard and return whole the goods seized subject to forfeiture for suspected violations of Customs laws. *H.F. Allen Orchards,* 749 F.2d at 1575; *cf. Jarboe-Lackey Feedlots, Inc. v. United States,* 7 Cl.Ct. 329, 339–40 (1985).[19] For this additional reason, the existence of a contract claim within the jurisdiction of this court cannot be recognized. Accordingly, plaintiff's complaint must be dismissed.

### III

Jurisdictional issues aside, there is sharp disagreement whether plaintiff has satisfactorily proven that it suffered any compensable loss. Where the blame for any such loss suffered lies, and the monetary extent (if any) of any such loss, are also controverted. The conclusions stated in section II would normally obviate any necessity to explore those areas. In view of the vintage of this case, its tortuous history, and its present posture, however, it is deemed appropriate, in an effort to expedite final resolution of the case, to discuss—if in somewhat less detail than would obtain had an implied in fact contract been found—the matter of damages.

Plaintiff asserts that when the Customs Service finally released the seized merchandise in its possession to plaintiff in late October, 1970, a total of 81,680 rolls of film, and 1,055 camera kits, of a claimed total market value of $102,178.22, were "missing" from the first shipment, and a total of 76,040 rolls of film, 8,100 flash bulbs, 774 electric shavers, 3,182 cassette tapes, 605 tape cassettes, and various other items, of a claimed total market value of $107,949.83, were "missing" from the second shipment.[20] Plaintiff's position is vigorously, and validly, challenged here.

### A

For purposes of Sections III A and III B of this opinion, the existence of an implied in fact contract of bailment obligating defendant, as bailee, "to use due care" (*Alliance,* 252 F.2d at 532) to preserve and protect the seized merchandise during the period in which the Customs Service held that merchandise "subject to forfeiture" is assumed. On that assumption, the evidence of record justifies two conclusions. The first is that with respect to the first shipment, the duty to use due care was not fully met by defendant. The second is that plaintiff has failed to establish any breach of such duty with respect to the second shipment. The bases for these essentially factual conclusions follow.

The first shipment, seized shortly after its March 17, 1970, arrival at Sea-Land's terminal, consisted of at least 831 cartons of goods, containing (in round numbers) some 2,900 camera kits, 248,000 rolls of film, and 67,000 flashbulbs, in a single large container.[21] Pursuant to government

19. Parenthetically, neither the arguments on brief nor the opinion of the court in *Jarboe-Lackey* (discussed in supplemental briefs filed in March and April 1985) did, or could, reflect any judgments with respect to the facts of *this* case as established at trial.

20. The merchandise was released to representatives of plaintiff at the Customs Service warehouse at 201 Varick Street, in New York City, and was then transported by truck to plaintiff's warehouse on the seventh floor of a building at 928 Broadway, in New York City. Plaintiff's president testified that he personally counted

the goods as they reached the seventh floor. Plaintiff's damage calculations utilize quantities derived by subtracting, from invoiced amounts, the numbers of items plaintiff's president listed as having been returned to the warehouse.

21. The quantities stated in the text are derived from invoices covering the first shipment. The government's implicit contention that it did not take possession of the first shipment until the merchandise in that shipment physically reached the Customs Service warehouse at 201 Varick Street, New York City, New York, is specious.

directions, that container was opened, resealed, and then detained for a brief period within the full container area (or container yard) at Sea-Land's terminal. The container was then moved to Shed 222, a large shed with platforms at the terminal. On or about March 23, 1970, shortly after its arrival at Shed 222, the container was opened and stripped (*i.e.*, its contents were removed from the original container and placed on the platform).[22] The number of cartons making up the shipment was inventoried by the Customs Service, and the goods were then placed in a second container, which was then sealed and left on the platform.[23] The following day, the cartons were removed from the second container by government personnel, counted and inventoried by a Customs inspector, and moved into Shed 222.[24] During (or shortly after) the process the Customs Service decided to seize the first shipment.

Although Shed 222 contained a separate, padlocked, security area, or "Customs crib," for the storage of goods seized by the Customs Service, that area was too small to accommodate all of the goods in the first shipment, and some of the seized merchandise was simply left in an unsecured area inside Shed 222.[25] A Sea-Land guard was stationed full-time at Shed 222, but the record does not establish that his duties included safeguarding merchandise seized by the Customs Service. The Customs Service itself did not assign a guard to Shed 222 for that purpose, nor does the record satisfactorily establish that it effectively sought to have Sea-Land to assign a guard to secure the goods once they were inside Shed 222.

During the time the seized merchandise was stored in Shed 222, some pilferage occurred.[26] The Customs Service was, or at the very least should have been, aware that pilferage was taking place. On or about April 14, 1970, most of the first shipment was transferred to the Customs Service warehouse at 201 Varick Street, New York City, New York ("201 Varick Street"); an additional 19 cartons (not included in the April 14, 1970, move) were transferred to 201 Varick Street on or about April 20, 1970.[27]

The second shipment, seized shortly after its April 3, 1970, arrival at Sea-Land's terminal, consisted of rolls of film, flash bulbs, razor blades, electric shavers, and various other kinds of merchandise in two containers. The containers were opened by the Customs Service for examination (and resealed) shortly after their arrival; they were reopened a few days later (for the purpose of taking photographs of the contents) and again resealed. On or about April 7, 1970, the goods were seized. The containers remained at Sea-Land's terminal, sealed, until on or about April 20, 1970, when they were moved to 201 Varick Street. The goods in the containers were then unloaded and stored in the Customs Service warehouse.

Between May 11 and 26, 1970, in accordance with normal procedures, Customs Service personnel at 201 Varick Street prepared an inventory of the contents of the

---

**22.** The weight of the credible evidence is that when Customs Service personnel arrived at Shed 222 to strip the container, it was still sealed.

**23.** Moving the goods into the new container was completed late in the day. The container itself could not have been moved into Shed 222.

**24.** The overall quantities of camera kits and flashbulbs found did not differ substantially from those invoiced. The inventory does reflect a shortage (in terms of invoiced quantities) of some 3,000 rolls of film. The record does not, however, establish that the invoiced quantities were reliable.

**25.** The Customs Service did not ask Sea-Land to provide a larger security storage area. Had it done so, the request would undoubtedly have been granted.

**26.** The merchandise was in large cartons containing smaller cartons or boxes of film, camera kits, and flashbulbs. Some 10 or more of the large cartons were broken open while the goods remained in Shed 222, and some of the contents of those cartons disappeared.

**27.** Not all of the merchandise landed as part of the first shipment reached 201 Varick Street. By the time the shipment was transferred from Shed 222, some pilferage had taken place.

two seized shipments. In general terms, the 201 Varick Street inventory of the first shipment reflected that some of the goods inventoried at Shed 222 on or about March 24, 1970, had subsequently disappeared.[28] The 201 Varick Street inventory of the second shipment reflected no more than minor differences between invoiced (not inventoried) quantities of goods and those actually counted at 201 Varick Street.[29]

The Customs warehouse at 201 Varick Street was quite secure. Access into the building through open doors (or truck loading bays) was controlled by GSA or Customs Service guards at all times, and all seized merchandise was stored behind locked gates. To enter the area where seized goods were stored, one had to be accompanied by a security guard. The evidence does not support a finding that any of the goods in either of the two shipments seized and subsequently transported to 201 Varick Street thereafter were lost, stolen, or misplaced by reason of any governmental lack of due care or negligence.[30]

■ Indeed, with respect to the second shipment, the evidence fails to establish any loss, at any time, due to defendant's (or Sea-Land's) lack of due care. The two containers seized in April 1970 were opened only briefly by Customs inspectors on the day of arrival, and were promptly resealed. The containers were reopened briefly a few days thereafter for valid reasons, and were again resealed. While at Sea-Land's terminal the merchandise seized was continuously kept in sealed containers, and it was moved to 201 Varick Street in sealed containers. After arrival there, it was maintained by the Customs Service under quite

secure conditions, and behind locked gates. No failure to use due care at any point between the second shipment's arrival and the ultimate release of merchandise to plaintiff on or about October 29, 1970, has been proven with respect to that shipment.

■ Due care was not taken by the Customs Service, however, for part of the period the goods in the first shipment were in the government's possession. The weight of the credible evidence is that after the first seizure, some of the goods in the first shipment were stored, under the direction of the Customs Service, in an exposed area in Shed 222. The Customs Service did not request that Sea-Land provide a larger secure area within which to keep the goods, nor did the Customs Service assign (or see to the assignment of) a guard to protect them. With awareness that cartons of merchandise readily accessible to passersby, and containing film, flashbulbs, and camera kits, were being broken open, and that some of the seized merchandise was disappearing, the goods were nonetheless allowed to remain in Shed 222, more or less unprotected, for three to four weeks.

Assuming the existence of an implied in fact contract of bailment here, defendant does not deny that, as bailee, it would be under a duty to use due care to protect the seized merchandise. While it perfunctorily argues that plaintiff has failed to prove that all of the seized merchandise was not returned to it, and that plaintiff has also failed to prove that any loss occurred while the seized merchandise was in defendant's "actual (as opposed to constructive) possession," these arguments have no merit.[31]

---

**28.** A comparison of the two inventories of the first shipment reflects both shortages and overages of various kinds of film. The net shortages shown, however, were 348 flashbulbs, 3 camera kits, and 4,124 rolls of various sizes of film.

**29.** A comparison of the second shipment's invoiced quantities with the inventory reflects both overages and shortages of various kinds of film, with a net shortage of 1,000 rolls. There were other shortages (primarily of cassette tapes) and overages, as well. In terms of dollar value, the net shortages were very small.

**30.** Plaintiff's argument that a huge diminution in the bulk of the seized merchandise occurred between the time of its move to 201 Varick Street and its later release to plaintiff has been carefully considered, and found wholly unpersuasive.

**31.** Defendant's emphasis on "actual" possession is misplaced. It exercised exclusive control over the seized merchandise from seizure to release. Pilferage occurred during that period for which (assuming bailment) defendant, as possessor of the goods, is charged with responsibility.

Should defendant be held to be a bailee, it would be liable to plaintiff for a failure to use due care to safeguard the first shipment of merchandise it seized during a part of the term of the bailment.[32]

### B

In approaching the matter of damages, it must be borne in mind that plaintiff "bears the burden of proving the fact of [compensable] loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation." *Willems Industries, Inc. v. United States*, 295 F.2d 822, 831, 155 Ct.Cl. 360 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962); *see also Palmer v. Connecticut Ry. Co.*, 311 U.S. 544, 561, 61 S.Ct. 379, 385, 85 L.Ed. 336 (1941) (the evidence must furnish "a basis for a reasoned conclusion"); *Electronic & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358, 189 Ct.Cl. 237 (1969). Measured by the governing standard, plaintiff's proof concerning the first shipment is far from satisfactory.[33]

Plaintiff's damage calculations for the first shipment start with invoiced quantities. The quantities of goods invoiced differed (albeit not substantially) from the quantities actually found and counted at Shed 222 shortly after that shipment was landed. The proof does not establish, however, that any discrepancies between in-

voiced and inventoried goods were defendant's (or Sea-Land's) fault. Indeed, for some invoiced items, the inventory count reflected a greater quantity of goods than did the invoices. On this record, the count made by defendant in the process of moving the goods from the platform into Shed 222 is the most reliable starting point for determining the amount of goods lost from the first shipment between its detention and its release to plaintiff in late October 1970.

From a careful study of the entire record, the best available method of arriving at the amount of loss is to subtract from the quantities found on the initial inventory at Shed 222 the quantities found during the Customs Service inventory prepared at 201 Varick Street after the first shipment was transferred there from Shed 222.[34] When the initial inventory and the 201 Varick Street inventory are compared, plaintiff's loss is far less than that claimed.

Plaintiff claims that 81,680 rolls of film, and 1,055 camera kits, of a total value of $102,178.22, were missing from the first shipment. The weight of the credible evidence is that 3 camera kits, and some 5,250 rolls of CX 620 Kodacolor film, were missing. While a comparison of the two inventories idnicates a loss of 57,500 rolls of CX 126–20 Kodacolor film, it also indicates a balancing overage of 59,200 rolls of CX 126–12 Kodacolor film. It is fair to infer that the CX 126 Kodacolor film was mis-

---

**32.** Neither the action of plaintiff's insurance company on plaintiff's claim for loss of the goods seized by the Customs Service, nor Sea-Land's argument that plaintiff has "failed to offer any credible proof of loss" justifies a different conclusion. Other government arguments (the claim that the "inventory" of released merchandise by plaintiff's president lacks any probative value, and that for a number of other reasons plaintiff's damage proof is faulty) bear more on the extent of plaintiff's monetary loss than on the issue of failure to use due care.

**33.** Because of the absence, for more than one reason, of any liability to plaintiff for damages with respect to the second shipment, that shipment need not and will not be discussed at this point.

**34.** As noted above, there is no credible proof of loss or damage following the transfer of the

seized merchandise to 201 Varick Street. While plaintiff's president testified at length about his personal count of the merchandise as it arrived at plaintiff's warehouse following the release of the goods, that self-serving testimony was neither persuasive nor of any probative value. The testimony and the "count" do not satisfactorily establish the quantities of merchandise released by the Customs Service to plaintiff's representatives at 201 Varick Street. The absence of prompt complaint to the Customs Service about the great losses supposedly discovered on October 29, 1970, the nature of the "count," the absence from the record of any basic, underlying, "count" documents, the manner in which the summary in evidence was prepared, and other factors, abundantly justify the conclusion that the "count" does not merit credence.

described either at Shed 222 or at 201 Varick Street, not that any of the CX 126 Kodacolor film was actually lost. While some 348 flashbulbs were missing according to the inventories mentioned above, plaintiff states that all flashbulbs invoiced were returned to it, and this item is therefore omitted from the damage calculation.

Plaintiff's damage for loss or destruction of goods is (again, assuming bailment) to be calculated at the fair market value of those goods at the time of loss or destruction. *See S.W. Aircraft, Inc. v. United States*, 551 F.2d 1208, 1213, 213 Ct.Cl. 206 (1977). The evidence supports a market value of $.7969 per roll of CX 620 Kodacolor film, and a value of $14.238 per camera kit, or a total of $4,226.43, computed as follows:

| Film: | 5,250 rolls | × | $ .7969 | = | $4,183.72 |
| Camera Kits: | 3 kits | × | $14.238 | = | 42.71 |
| | | | Total | | $4,226.43 |

### C

On the assumption stated in Section III A, *supra*, plaintiff would be entitled to judgment for $4,226.43. Since defendant is not liable to plaintiff for breach of an implied in fact contract of bailment, however, the complaint is to be dismissed.