INSURANCE COMPANY OF NORTH AMERICA, as subrogee of John F. Turano & Sons, Inc., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 407–84C.

United States Claims Court.

Sept. 22, 1986.

David L. Mazaroli, New York City, for plaintiff.

Platte B. Moring, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Plaintiff, Insurance Company of North America, as subrogee of Turano, instituted action in this court to recover the value of furniture destroyed during a customs inspection. This matter comes before the court on the parties' cross-motions for summary judgment. The issue presented is whether an implied-in-fact bailment contract existed between J.F. Turano and Sons, Inc. ("Turano"), a corporation engaged in the sale of imported furniture,

and the United States Customs Service ("Customs"). For the reasons set forth below, summary judgment is granted in favor of the defendant.

### FACTS

In all material respects the facts are uncontested. Nevertheless, in considering defendant's motion for summary judgment, where there is any dispute, the facts alleged by plaintiff will be regarded as correct. *Cf. Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

On August 11, 1983, the S/S TFL Liberty arrived at the Port of Newark, New Jersey, carrying two containers of furniture from Italy consigned to Turano, TFLU 451475.8 and TFLU 451896.4. Customs initiated a computer inquiry about Turano, the response to which indicated that the importer was subject to a Drug Enforcement Administration alert[1] for possible smuggling of heroin from Italy. On August 18, 1983, Customs decided to intensively examine the furniture and ordered the carrier to have it available for inspection on August 23, 1983.[2] Prior to the examination by Customs, the shipment was intact and in good condition.

On August 19, 1983, Customs refused to allow representatives of Turano to take delivery of the merchandise pending completion of the inspection. On that same day, Mr. Harold Dichter of Leyden Customs Expediters, Inc., a customshouse broker for Turano, contacted a Customs supervisor in the enforcement section and asked if the shipment could be examined at the importer's premises. The request was denied. Mr. Dichter then called Mr. Vincent Araneo, Assistant Section Director, Inspector for Control, and repeated his request

for an examination at the importer's premises. Mr. Araneo denied the request. Later that day, Mr. Dichter wrote Mr. Benjamin C. Jefferson, the Newark Area Director, again unsuccessfully asking for outside examination.

On August 22 and 23, 1983, the customs enforcement team examined the contents of the two containers at Maher Terminal, Port Elizabeth, New Jersey. The examination by Customs on August 22nd and 23rd was a partial one. The enforcement team examined the merchandise by drilling small holes in discrete areas of the furniture, leaving the furniture otherwise intact. No contraband was detected upon completion of the inspection, and on August 23, 1983, Customs released the shipment. The furniture was not picked up by Turano.

On August 23, 1983, Mr. John Turano, a principal shareholder of Turano, contacted his attorney, Mr. Mark Tulip. Mr. Turano indicated that the shipment of furniture consigned to his company had been inspected by Customs and expressed his concern that Customs did not perform an inspection of the entire shipment. He stated that he was not willing to accept delivery under existing circumstances because of concern that his company could be accused of some type of violation for which it was not responsible.

On August 24, 1983, Mr. Tulip, upon the instructions of Mr. Turano, contacted Customs and requested that the furniture be re-examined based on the fact that Customs' initial inspection was only a partial one. On the basis of the request from Mr. Tulip, Mr. Roselle, the Section Supervisor, cancelled the release of the shipment and ordered a second examination of the furniture. The importer was not informed of

---

1. Plaintiff states that there was no basis for the alert. Defendant does not attempt to explain it. In any event, the only significance the court attaches is that the alert occurred as part of the background to the inspection.

2. Plaintiff does not contend that the actions taken by the Government were unlawful. *See* 19 C.F.R. § 151.1 (1985) ("The District director

shall examine such packages or quantities of merchandise as he deems necessary for the determination of duties and for compliance with the Customs laws and any other laws enforced by the Customs Service."). *See also* 19 U.S.C. §§ 482, 1467, 1499, 1581(a) (1982); 19 C.F.R. § 162.6 (1985).

the possible consequences of a second examination.[3]

On this same date, Mr. Dichter met with Mr. Snyder, the Regional Commissioner of Customs. He told Mr. Dichter that Customs had the funds to compensate Turano for any damage which might incur during the inspection.

Re-examination also began on August 24, 1983. Customs used three narcotics dogs during the inspection. The narcotics dogs drew attention to five pieces of furniture which were subsequently taken apart for further examination. No contraband was found. On August 25, 1983, Customs made the decision to dismantle each piece of furniture. During the course of the second examination, the furniture was damaged to the extent that it was unusable and considered a total loss.

## PLEADINGS

On August 6, 1984, plaintiff, as subrogee of Turano, instituted an action in this court seeking damages of $88,440.00 for the value of the furniture shipment. On November 9, 1984, defendant moved to dismiss the complaint for lack of jurisdiction pursuant to Rule 12(b) of the Rules of this court and 28 U.S.C. § 1500 (1982). Plaintiff had filed a complaint in the Southern District of New York on August 9, 1984, seeking monetary damages in tort in an action based on the same operative facts as the claim in this court. On December 19, 1984, this action was suspended pending notification of final judgment in plaintiff's action in the district court. On February 10, 1986, the parties to the district court action stipulated to a voluntary dismissal of that lawsuit pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. Consequently, the suspension of these proceedings was vacated on March 5, 1986. Both parties have now moved for summary judgment.

## DISCUSSION

In order for plaintiff to defeat defendant's motion, the facts set forth in plaintiff's response to the defendant's motion must be susceptible of a construction that an implied-in-fact contract of bailment arose between its subrogor and defendant. Moreover, the terms of such an implied contract would have to have been breached by defendant's conduct here. If the record does not evidence any facts from which an implied-in-fact contract may be inferred, defendant is entitled to judgment as a matter of law.

In determining whether the facts alleged permit the necessary inferences, the analysis must begin with the elements of a bailment. The Court of Claims [4] has taught that a bailment relationship arises "where an owner, while retaining title, delivers personalty to another for some particular purpose upon an express or implied contract." *Lionberger v. United States,* 178 Ct.Cl. 151, 167, 371 F.2d 831, 840, *cert. denied,* 389 U.S. 844, 88 S.Ct. 91, 19 L.Ed.2d 110 (1967).

Plaintiff does not assert that an express contract was formed. It argues that the facts warrant a finding that an implied-in-fact contract existed. A contract implied in fact is not created by an explicit agreement of the parties, but is "inferred as a matter of reason or justice from the acts or conduct of the parties." *Prudential Insurance Co. v. United States,* 801 F.2d 1295, 1297 (Fed.Cir.1986). An implied-in-fact contract, however, possesses the same key elements as an express contract: a definite offer, an unconditional acceptance and consideration. *Baltimore & O.R.R. v.*

---

3. Defendant would contest the import of this assertion in view of Mr. Dichter's letter of August 19, 1983, to Mr. Jefferson which made reference to an earlier inspection by Customs which resulted in $30,000.00 damage to Turano's merchandise.

4. It is well settled that contracts to which the government is a party are normally governed by federal law, not by the law of the state where they are made or performed. *United States v. County of Allegheny,* 322 U.S. 174, 183, 64 S.Ct. 908, 913–14, 88 L.Ed. 1209 (1944); *Prudential Insurance Co. v. United States,* 801 F.2d 1295, 1297 (Fed.Cir.1986); *Key Data Corp. v. United States,* 205 Ct.Cl. 467, 482, 504 F.2d 1115, 1124 (1974).

*United States*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923); *Fincke v. United States*, 230 Ct.Cl. 233, 675 F.2d 289 (Fed. Cir.1982); *City of Klawock v. United States*, 2 Cl.Ct. 580, 584–85 (1983), *aff'd*, 732 F.2d 168 (Fed.Cir.1984).

■ With respect to an allegation that a Customs detention constitutes a bailment, this court has said that a plaintiff must show an agreement based upon the meeting of the minds that can be factually implied from the conduct of the parties under circumstances which demonstrate their tacit understanding. *Hatzlachh Supply Co. v. United States*, 7 Cl.Ct. 743, 748 (1985).[5]

The facts plaintiff relies on are essentially these: Plaintiff requested re-examination after Customs had released the shipment; Customs retained and re-examined the furniture; plaintiff was not informed of the likelihood of damage or destruction; and a representative of Customs informed Mr. Dichter that funds were available to compensate the importer for damage incurred during the course of the inspection.

■ These general characterizations of what took place, however, even if true, are insufficient as a matter of law to constitute an implied-in-fact contract between plaintiff and the defendant. They cannot substitute for specific factual allegations which would embrace the elements of an implied-in-fact contract: an unambiguous offer by one party and an unconditional acceptance by another. *See Hatzlachh*, 7 Cl.Ct. at 748; *City of Klawock*, 2 Cl.Ct. at 584. No facts presented here would suggest in any way a promise, representation or statement by any authorized government official that plaintiff's goods would be returned damage-free. *See Shaw v. United States*, 8 Cl.Ct. 796, 799 (1985). The most that can be deduced from the allegations is that under prompting from plaintiff's subrogor, defendant did a second, more thorough examination. Even if this could be characterized as an agreement, it was merely an agreement to do no more than Customs is delegated to do by law. More importantly, plaintiff is unable to point to any evidence tending to show a meeting of the minds concerning how defendant was allegedly going to conduct the second inspection, or that it agreed to pay for any damage.[6] Thus, the relationship between Turano and defendant "was not transformed into one founded upon an implied-in-fact contract of bailment" merely by the government's deci-

---

**5.** The Claims Court decision in *Hatzlachh* provides guidance here. In that case, plaintiff's goods had been seized and declared forfeited for Customs violations. The plaintiff's allegation in that case that an implied-in-fact contract existed between it and Customs to preserve and redeliver the property was dismissed by the Court of Claims for lack of jurisdiction over claims arising from Customs detentions. *Hatzlachh Supply Co. v. United States*, 217 Ct.Cl. 423, 425, 579 F.2d 617, 619, 621 (1978). The Supreme Court vacated that decision, however, and remanded the case after holding that under the proper circumstances a bailment contract can arise from Customs' dealings with importers. *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 467, 100 S.Ct. 647, 651–52, 62 L.Ed.2d 614 (1980) (per curiam). Upon remand, the Claims Court held that Customs' agreement to deliver the seized goods upon payment of a fine did not constitute a "promise, representation or statement that [plaintiff's] goods would be guarded or carefully handled." *Hatzlachh*, 7 Cl.Ct. at 747.

Plaintiff asserts that the Claims Court holding in *Hatzlachh* is distinguishable because it involved loss to goods seized by the government in forfeiture proceedings. According to plaintiff, in *Hatzlachh* title to the property had been transferred to the Government, subject to judicial determination, and no bailment could be created. There was no uninterrupted title in the claimants as would constitute the basis of a bailment contract implied in fact.

The Claims Court, however, upon remand, did not base its holding upon this reasoning and in fact stated this position had doubtful validity. *Id.* at 749. Rather, the court stated:

[D]efendant's forcible and unilateral acts of seizing the goods and declaring them forfeited for violations of customs law may well not have "defined and consummated" the right and title of the government to those goods as of the times of seizures, [citation omitted] but the "existing circumstances" nonetheless clearly negated any notion of a "tacit understanding" to an implied-in-fact contract of bailment with respect to those seized goods. *Id.* at 749–50.

**6.** Mr. Snyder's statement that there were funds available to pay for damage incurred during inspections by Customs does not constitute a promise to pay.

sion, within its statutory discretion, to conduct the second inspection. *See Hatzlachh,* 7 Cl.Ct. at 750.

Plaintiff's primary support is derived from the decision by the Court of Appeals for the Second Circuit in *Alliance Assurance Company v. United States,* 252 F.2d 529 (2d Cir.1958). That case does not call for a different result, however. In *Alliance* the court found an implied-in-fact contract of bailment between an importer and Customs. As a matter of course, the goods there were inspected by the Invoice Division at the Customs House to determine if they were of the value and quantity declared in the invoice. In order to assure the receipt of the goods by the importer after invoice inspection, the Invoice Division prepared ten so-called "Elliot Fisher" tickets, two of which were "designed to restore the goods to the owner" upon presentation to customs officials. *Id.* at 532. These two tickets were tendered by the importer at the close of Customs' business day. When the importer returned the following day to retrieve the goods, Customs was unable to locate them.

On those facts, the circuit court found an implied-in-fact contract to redeliver the goods after Customs had completed inspection, and noted that "[t]he elaborate set of ten tickets, at least two of which were designed to restore the goods to owner, [was] indicative of this promise." *Id.*

The difficulty with plaintiff's reliance on *Alliance* is twofold. First, there is no receipt system in the case at bar analogous to the tickets in *Alliance.* Plaintiff points, however, to the overnight detention in *Alliance* as the significant factual link between *Alliance* and this case. According to plaintiff, the tickets were, as the circuit court described them, merely "indicators" of an underlying agreement.

Admittedly, an overnight detention is present here. Plaintiff is unable, however, to point to any other facts in *Alliance* upon which that court relied to find a bailment contract. This leads to plaintiff's second difficulty with *Alliance.* If the ticket receipt system was unnecessary to the result, then for all intents and purposes *Alliance* stands for the proposition that a bailment is implied whenever Customs detains goods overnight. If *Alliance* indeed holds that, this court declines to follow it.

While plaintiff makes a valiant effort to demonstrate a *factual* basis for an alleged agreement here, plaintiff has failed to draw any real distinction between the relationship of the parties during the first and the second inspections. Its reading of *Alliance,* and the generality of the circumstances it points to in this case, lead inescapably to the conclusion that the agreement alleged is inherent in the customs inspection process. If any such legal relationship exists, however, it is created by implication of law rather than facts and is thus beyond this court's jurisdiction. *United States v. Minnesota Mutual Investment Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 502–03, 70 L.Ed. 911 (1926); *Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Fincke,* 230 Ct.Cl. at 246–47, 675 F.2d at 295–97; *Hatzlachh,* 7 Cl.Ct. at 748.

### CONCLUSION

While this court is sympathetic to plaintiff's circumstances, it concludes that there are no material facts in dispute, and that defendant is entitled to judgment as a matter of law. Accordingly, defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. The clerk is directed to enter judgment for defendant. No costs.[7]

IT IS SO ORDERED.

---

**7.** Defendant also seeks summary judgment on the grounds that the court lacks jurisdiction over the subject matter. That ground for dismissal is rejected. The decision here goes to the merits of plaintiff's claim. *See Balboa Insurance Co. v. United States,* 775 F.2d 1158, 1163 n. 3 (Fed.Cir.1985).