**KOLLSMAN, A DIVISION OF SEQUA
CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–2038C.**

United States Claims Court.

March 16, 1992.

Wilsie H. Adams, Jr., Washington, D.C., for plaintiff. Jacob B. Pankowski and Jim Lamoureux, McKenna & Cuneo, of counsel.

Richard E. Rice, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Major J. Mackey Ives, Dept. of the Army, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion for summary judgment. The key issue. implicating the propriety of a grant of summary judgment is whether the Government impliedly contracted with a defense contractor to manufacture military hardware in advance of a contemplated written contract.

## FACTS

The following facts are undisputed, unless otherwise noted. On December 22, 1987, the Government of the Arab Republic of Egypt ("Egypt") agreed to purchase from the United States Army Armament, Munitions and Chemical Command ("AMCCOM") 140 Laser Range Finders ("LRFs") at a cost of $54,611.04 per LRF, 170 Ballistic Computer Systems ("BCSs") at a cost of $27,523.58 per BCS, and numerous other defense items. The agreement, Case EG–B–UHO, was executed on "DD FORM 1513," entitled "UNITED STATES DEPARTMENT OF DEFENSE OFFER AND ACCEPTANCE" (referred to as the "Letter of Agreement" or the "LOA"), and indicated that payment was to be by "FMS [Foreign Military Sale] Credit." Funds provided through the Foreign Military

Credit Sales Program are loans made by the United States to foreign governments that the United States has released from having any contractual liability for repayment. On February 23, 1988, AMCCOM commenced implementation of Case EG–B–UHO (the "Egyptian FMS case") based upon AMCCOM's receipt of certified funds.[1]

In a letter of January 14, 1988, Egypt requested that Case EG–B–UHO be amended to require that the LRFs and BCSs be obtained by sole source procurement from "Kollsman Company" (Kollsman, A Division of Sequa Corporation) ("plaintiff"). Brigadier General Walter Kastenmayer, Commander of the United States Army Security Affairs Command ("USASAC"), approved the request on February 5, 1988. Plaintiff, at AMCCOM's request, provided a price quotation for the LRFs and BCSs to AMCCOM on February 22, 1988. Plaintiff quoted a fixed price of $15,184,000.00—$57,700.00 for each LRF and $41,800.00 for each BCS. Amendment 1 to Case EG–B–UHO incorporated several modifications to Case EG–B–UHO, including the requirement of sole source procurement from plaintiff and a revision of the unit prices of the LRFs and the BCSs to $72,272.07 per LRF and $53,551.17 per BCS. Egypt accepted Amendment 1 on May 5, 1988, and AMCCOM commenced implementation of amended Case EG–B–UHO on August 25, 1988, based upon AMCCOM's receipt of certified funds.

Prior to being designated the sole source for the LRFs and BCSs in the Egyptian FMS case, plaintiff was manufacturing LRFs and BCSs as a prime contractor under AMCCOM Contract DAAA09–82–C–5098 (the "AMCCOM Contract") and as a subcontractor under United States Army Tank–Automotive Command ("TACOM") Contract DAAE07–88–C–A008 (the "TACOM Contract").[2] On May 6, 1988, both

---

1. At argument defense counsel indicated that receipt of certified funds is merely a precondition to procurement, while plaintiff's counsel indicated that receipt of the funds imposes an absolute obligation on Egypt to "pay" and on the United States to "buy." Because neither counsel offered support for their assertions, this matter will be resolved at trial.

2. Plaintiff's predecessor or affiliate, Kollsman Instrument Company, A Division of Sun Chemical Corporation, actually entered into these contracts.

plaintiff and TACOM requested that AMC-COM authorize plaintiff to use FAITE II equipment—government-furnished equipment that is needed in conjunction with the production and final acceptance of LRFs and BCSs—for work related to the TACOM Contract. AMCCOM was managing the equipment in conjunction with the AMC-COM Contract and declined to authorize plaintiff to use the equipment for the TA-COM Contract, stating in a memorandum to TACOM dated May 24, 1988:

It is not possible for AMCCOM to comply with Kollsman's request to use this FAITE II equipment. This requires a current production contract that will remain open and active for an extended period of time. AMCCOM does not have any such contracts with Kollsman. Subject contract is in the process of being closed out, and there is no legal justification for AMCCOM to enter into a facilities type of contract with this contractor.

On June 2, 1988, TACOM requested that AMCCOM transfer accountability for the FAITE II equipment to the TACOM Contract, which was under current production. The transfer occurred on June 16, 1988.

On September 20, 1988, plaintiff's management met with Commanding General of AMCCOM, Major General Marvin D. Brailsford, and other government officials. At the meeting plaintiff stated that the requirements for the Egyptian FMS case would be manufactured as a follow-on to the TACOM Contract and that plaintiff intended to maintain its current production line so that the tight delivery schedule for the Egyptian FMS case could be met. In addition, plaintiff explained that keeping the production line active was necessary to reduce costs. Defendant asserts that the government representatives present at the meeting were not knowledgeable at that time about the specifics of the Egyptian FMS Case. In addition, defendant asserts that no government representative requested that plaintiff maintain its production line or that plaintiff produce the LRFs and BCSs for the Egyptian FMS case. Defen-

dant relies on plaintiff's answer to an interrogatory querying the substance of statements made by government representatives at the meeting; plaintiff's response identified no statement on point. Plaintiff disputes defendant's assertions and contends that additional discovery is needed to determine the knowledge of the AMCCOM representatives present at the meeting and to determine whether the Government requested plaintiff to maintain its production line.

On November 8, 1988, plaintiff again met with AMCCOM personnel including Procurement Contracting Officer Clinton E. Warren and Jack Dietz, AMCCOM Weapons Branch Chief, officials with authority to award contracts. Plaintiff informed AMCCOM that plaintiff was going to continue production of the BCSs and LRFs for the Egyptian FMS case in order to save money and to provide the Government and the Egyptians with an earlier delivery schedule. Additionally, plaintiff stated that it already had ordered long-lead material in order to meet the requirements of the Egyptian delivery schedule. AMCCOM representatives stated that the projected contract award date was October/November 1989, and the parties discussed what each needed to do to effectuate, as quickly as possible, a formal contract for the Egyptian FMS case. According to plaintiff's response to an interrogatory, AMCCOM advised plaintiff that AMCCOM " 'declined to issue a letter contract [3] because the administrative requirements for such a contract were similar to those for a definitized contract.' " Def's Proposed Findings of Uncontroverted Fact No. 16, filed Dec. 11, 1991. Plaintiff, relying on this interrogatory, asserts that defendant advised plaintiff that defendant anticipated awarding the formal, definitized, sole source contract to plaintiff before AMCCOM could accomplish all of the administrative tasks necessary to execute the requested letter contract.

---

**3.** A letter contract would recognize pre-contract costs; it authorizes commencement of work on the plenary contract.

Defendant claims that government representatives informed plaintiff during the November 8, 1988 meeting of the contracting processes at AMCCOM, outlining the approvals required for AMCCOM to issue a sole source request for proposals (RFP) for the Egyptian FMS case. Contracting Officer Warren's handwritten notes on which defendant relies state: "Jack D. presented disertation [sic] on proc. & what was necessary as far as approvals prior to soliciting." Plaintiff correctly rejoins that these notes are too vague to establish defendant's asserted fact. Defendant also maintains that no government representative at the meeting requested that plaintiff continue production of the LRFs and BCSs or that plaintiff order long-lead material. Plaintiff disputes defendant's contention, stating that further discovery is needed to determine the contents of the November 8, 1988 meeting and to determine if the Government requested plaintiff to continue production of the LRFs and BCSs.

In an internal AMCCOM memorandum of December 7, 1988, Contracting Officer Warren stated that although formal responses to Mr. Dietz's recommendation of October 4, 1988—that the LRFs and BCSs for the Egyptian FMS case be solicited competitively, rather than sole source with plaintiff—had not been received, AMCCOM and USASAC personnel had indicated that the procurement was to remain sole source with plaintiff. Contracting Officer Warren stated: "In order to process the J & A [Justification and Approval] that is required for this procurement in a timely manner, it is requested that an interim response be furnished on a sole source versus a competitive action being used on this requirement." Defendant, relying on this statement, asserts that Contracting Officer Warren advised AMCCOM that a J & A would be necessary to authorize sole source procurement from plaintiff. Plaintiff disputes that the document gave such notice because it does not advise that "a

*formal document* known as a 'Justification and Approval' or 'J & A' would be necessary...." Plf's Statement of Genuine Issues No. 7(b), filed Jan. 10, 1992 (emphasis in original). This response amounts to quibbling and is insufficient.

In a letter dated December 15, 1988, Egypt informed USASAC that the procurement schedule established by Amendment 1 to Case EG–B–UHO needed to be modified to require that the LRFs and BCSs be available in 20 months rather than the 29 months allowed by the amendment. Egypt also requested that USASAC confirm that the LRFs and BCSs were of the latest configuration built by plaintiff. On January 9, 1989, plaintiff, having been notified of Egypt's letter, advised AMCCOM that plaintiff could meet the 20–month delivery schedule because the hardware was currently in production.[4] In a letter dated January 10, 1989, USASAC Lieutenant Colonel Richard J. Luckenbill informed Egypt of the following:

USASAC has asked the Armament, Munitions and Chemical Command, who manages this case, to determine the feasibility of your request. Every effort will be made by HQ AMCCOM to reduce the leadtime of the Laser Range Finders and Ballistic Computer [Systems] currently due to be shipped in 29 months or January 1991.[5] The contract is scheduled to be awarded by 30 November 1989. Following contract award your request to expedite delivery of these items in April 1990 will be specifically pursued. The items you will receive will be the latest configuration being built by Kollsman.

A Modification of Offer and Acceptance to specifically reduce the leadtime reflected for line items 2 and 3 [the LRFs and BCSs] is not required. Modifications are prepared only when changes or exten[s]ions exceeding 90 days of the delivery commitment date are evident.

4. Neither Egypt nor plaintiff stated the date from which the 20 months was timed to run.

5. Although the letter gives a January 1991 date, later documents reveal that the parties were

unclear as to whether the 29 months was to run from the implementation date of the Letter of Agreement, February 1988 (or July 1990), or Amendment 1, August 1988 (or January 1991).

This office will continue to pursue your request to reduce the procurement as requested. We will keep your office and the OMC, Cairo informed of our progress.

On January 13, 1989, plaintiff advised AMCCOM: (1) Because a delay would result if plaintiff were required to ask Egypt for instructions on plaintiff's latest configuration, plaintiff would use the current government Technical Data Package ("TDP") for production of the LRFs and BCSs for the Egyptian FMS case rather than plaintiff's own TDP; (2) plaintiff would be able to submit its proposal to AMCCOM for the Egyptian FMS case within one week of receipt of the RFP from AMCCOM; and (3) should there be a break in plaintiff's production of the LRFs and BCSs, the Egyptians would be required to pay a higher price. Plaintiff also advised AMCCOM that Contracting Officer Warren stated both that " 'Procurement Pressure' " would be applied to obtain the TDP aperture cards needed by plaintiff to compare its configuration to the Government's configuration and that the "Army" would pay for the costs of furnishing the cards and plaintiff would pay for the costs of comparing the Government's cards to plaintiff's cards. According to declarant Robert Domini, plaintiff's Vice President, Programs, the Government generally will not release a current TDP in the absence of an ongoing procurement or contract. Defendant accepts this averment for purposes of summary judgment only.

On March 2, 1989, plaintiff sent a letter to TACOM requesting an extension of the rental agreement for the FAITE II equipment managed by TACOM in conjunction with the TACOM Contract. Plaintiff stated that the equipment (1) would be used for the TACOM Contract, (2) would permit plaintiff to compete for spare parts to support United States and foreign requirements, and (3) would be required for the Egyptian FMS case for which plaintiff anticipated receiving a contract from AMCCOM. On March 6, 1989, plaintiff sent a

second letter to TACOM regarding the FAITE II equipment and stated, with respect to the Egyptian FMS case:

Kollsman is currently producing M60 FCS hardware in anticipation of a directed procurement from AMCCOM to fulfill an Egyptian requirement for 140/170 BCS/LRF's per an FMS case detailed in LOA [Letter of Agreement] EG–B–UHO(A1).... We request usage of subject equipment for production and sale of this equipment.

TACOM responded, in a letter dated March 14, 1989, that it could not address plaintiff's March 6, 1989 request to use the FAITE II equipment for the Egyptian FMS case until the Letter of Agreement was signed.[6] Plaintiff asserts that its letters of March 2, 1989, and March 6, 1989, do not preclude the formation of an implied-in-fact contract.

On March 8, 1989, plaintiff sent a letter to AMCCOM regarding Defense Contract Administration Services ("DCAS") in-process inspection services. The letter recited the following:

In anticipation of a Request For Quotation from your organization covering the purchase of 170 Ballistic Computer Systems (BCS) and 140 Laser Range[ ] Finders (LRF) for Egypt under an FMS contract, Kollsman respectfully requests AMCCOM to provide authorization for the local resident DCAS Quality to perform in-process inspection on these systems.

In an effort to be in a position to best serve the U.S. Army as well as the Arab Republic of Egypt in expeditious delivery, Kollsman will commence manufacture in anticipation of a formal contract. It would appear to be a sound business practice in as much as we have produced many thousands of these systems for both U.S. Army use as well as FMS deliveries.

*No Liability On Government:*

already had been signed.

---

6. At argument defense counsel stated that TACOM was unaware that the Letter of Agreement

(a) Kollsman acknowledges, understands, and agrees that AMCCOM pre-contract authorization, and the authorization for DCAS in-process inspection, shall neither accrue, nor in any manner be considered a liability or obligation of the U.S. Government to pay or reimburse Kollsman for any performance UNLESS AND UNTIL a contract is in fact awarded by the Government to Kollsman. In other words, Kollsman shall bear the risk that all costs and performance by Kollsman under the 170 Ballistic Computer Systems (BCS) and 140 Laser Range Finders (LRF) for Egypt shall be at Kollsman's sole expense in the event no such award or contract is issued by the Government.

(b) Further, Kollsman agrees to indemnify and hold the Government harmless from and against any claim for costs associated with such performance and the requested authorization in the event no award or contract is in fact made to Kollsman for the subject supplies.

(c) Finally, this authorization shall not extend beyond 31 July 1989.

If requested by AMCCOM, Kollsman would be willing to provide an unqualified bond as security for Kollsman's reimbursement to the Government for DCAS services expended, in the event no contract is subsequently issued to Kollsman under the Program.

The foregoing request[ ] is limited to the in-process inspections, and Kollsman understands that *no* final inspection, tests or acceptance by the resident DCAS inspectors is requested or authorized under the limits of this advance agreement.

We feel this arrangement, under which Kollsman retains the sole and unqualified risk with respect to any costs incurred, is in the mutual interests of the U.S. Government, Kollsman, and the Government of the Arab Republic of Egypt. In this manner, without expense to AMCCOM, the schedule and price constraints of the Egyptian FMS Program can be maintained pending final issuance of the RFP, audit, and award of the resulting contract. We welcome the opportunity to further discuss this matter, and again respectfully request your authorization (at Kollsman's sole risk) for DCAS in-process inspection services under the subject Program.

Plaintiff withdrew this request to AMCCOM in a letter of March 30, 1989, stating: "Kollsman has re-evaluated its position regarding the request for in-process inspection services and wishes to retract that request in its entirety." Plaintiff asserts that the March 8, 1989 letter was a conditional offer that AMCCOM never accepted. In addition, plaintiff asserts that its statements in the letter do not preclude the formation of an implied-in-fact contract.

On March 7, 1989, plaintiff had telephoned AMCCOM regarding an upcoming meeting on March 9, 1989. According to plaintiff's record of conversation, plaintiff had stated that it wanted "to do whatever it takes to keep continuous production & eliminate possibilities of interruptions." In the March 9, 1989 meeting, plaintiff proposed, in a series of written recommendations, resolving TDP configuration issues "as part of negotiation." Plaintiff asserts that the focus of the meeting was the date by which Egypt required delivery of the LRFs and BCSs. An internal memorandum of plaintiff's, summarizing the meeting, stated:

> AMCCOM will work with us to meet the Egyptian need dates for 140 LRF/ 170 BCS hardware. If, as Kollsman has interpreted the LOA and all correspondence, the need is late '89 (O, N, D), then allowing approximately 6 months to revise the existing hardware to the USA [United States Army] TDP, we must be under contract by no later than June.

> All other issues are secondary to the main issue of *confirming* the Egyptian need dates. We *know* [sic] *have Ron's [Gende's] commitment* to work with us so that USA/Kollsman team can fulfill Egypt's requirements.

> *Secondary Issues*

> . . . .

> *Continuation of DCAS In–Process Insp. at Kollsman*

Under the conditions of the on-going Sales Stock and the forthcoming Sole Source Procurement AMCCOM will support our request. We have two approaches: 1) a non-disclaimer letter to AMCCOM, already reviewed with AMCCOM legal and should be no problem; 2) have DCAS call AMCCOM and they will inform DCAS of the forthcoming contract.

*Faite II Test Equipment*

AMCCOM will support thru TACOM and will upon contract award to Kollsman, transfer responsibility from TACOM to AMCCOM. The action is for Kollsman to supply copies of the TACOM letter to Roscoe Spencer at AMCCOM. This should be done by Fax ASAP. AMCCOM will contact TACOM to continue authorization to proceed.

In summary, an excellent meeting. We now have their full cooperation, however, the key to an award in June (July outside) is the Egyptian *need dates.*

(Emphasis in original.)

On April 7, 1989, plaintiff's Vice President, Marketing, Charles F. Richmond, wrote to Major General Brailsford, AMCCOM Commander, stating the following:

It was a pleasure for me to attend the Atlanta XV conference and have the opportunity to discuss with you directly Kollsman's products and the support of the Armed Forces. During our discussions I mentioned that Kollsman has a problem for which I solicited your support to help solve.

This problem, as you may recall, was relative to the LOA Egyptian government's requirement for 140 Laser Range Finders and 170 Ballistic Computer Systems.

When FMS Case # EG–B–UHO was approved and signed between the U.S. Government and Egypt, Kollsman was the designated sole source contractor, and based upon this letter of offer and acceptance, Kollsman, *at its own risk proceeded to buy materials in anticipation of the resultant contract. I further related to you that, to date, Kolls-* *man has received the majority of material and has approximately 60 units in various stages of manufacturing.* In this respect the following help is requested.

First, Kollsman needs AMCCOM approval to use government-owned FAITE equipment that is used for both in-process and final acceptance testing.

Second, since this is an anticipated U.S. Government contract, DCASMA [DCAS Management Area] Boston QAR [Quality Assurance Representative] is required to inspect in-process manufacturing as well as systems level manufacturing of the units. Both of the above items require AMCCOM written direction to allow the continued use of both the FAITE equipment and the DCASMA inspections.

Third, I would appreciate receiving an advance agreement that would recognize that the costs currently being incurred would be allowable as pre-contract costs.

I have taken the liberty to attach hereto a recommended draft of an advance agreement that would be most appreciated to provide coverage to Kollsman as well as to the DCASMA Boston organization.

(Emphasis added.) AMCCOM did not sign the attached advance agreement. Plaintiff contends that Mr. Richmond's letter does not reflect that plaintiff accepted the risk that it would not receive payment for its pre-award production efforts but, rather, reflects that plaintiff accepted some risk that it would not receive prompt payment for its efforts. The declarations of Messrs. Domini and Richmond propound this construction of the letter. In addition, plaintiff insists:

The only action mentioned in the letter which Kollsman took at its own risk was the purchase of some materials in anticipation of a formal contract. The letter does not say that Kollsman risked all of its pre-award production efforts. The letter also clearly recognizes that this slight risk was taken only at a very early

stage (around the first quarter of 1988) in the Egyptian FMS procurement.... Plf's Statement of Genuine Issues No. 15, filed Jan. 10, 1992.

An internal memorandum of plaintiff's, dated April 7, 1989, summarizing a meeting at AMCCOM the previous day, stated the following:

AMCCOM has the responsibility to meet the Egyptian need date of July 1990. (Case Implementation date Feb 1988 plus 29 months yields July 1990.) AMCCOM has interpreted the July 1990 as initial delivery of equipment not completion of total quantity. Based on the above and allowing for 14–15 months ARO lead time, the PMO has set an award target date of 15 June 1989.

Ron Gende admitted this was very optimistic, but he will bust butts to make it happen.... He was not receptive to a letter of intent or unsolicited proposal. He feels a submittal now can do more harm than good at this time. He would not say it but Procurement will be his biggest problem in meeting his target date for Contract Award.

. . . .

After the meeting we visited (courtesy) Craig Colledge who is OMBUDSMAN. He is aware of all the 140/170 activities underway at AMCCOM, but it was evident he was "normalized" by Procurement prior to our visit. Procurement knew we would be in to see him! He inferred, but would not say, that Procurement was resisting acceleration, and wanted the July 1990 date to be pushed out with Egypt concurrence. We told Craig there was no need to contact Egypt, but wait until we are negotiating contract and can better predict our delivery schedule, because July 1990 most likely will not be a problem. To hear first hand Procurement objections, we have scheduled a meeting with Colonel George on 11 April 1989, who is head of the Procurement Directorate....

According to plaintiff's April 10, 1989 Activity Report, Carl Day, Chief of Asia/Pacific Branch, AMCCOM, indicated

that he had erred on the implementation date for the Egyptian FMS case—that it was August, not February, 1988, which required delivery in January 1991. The report also indicated that plaintiff was informed that delivery needed to be completed by January 1991, not just commenced by that date, as an AMCCOM official had previously advised. An internal government memorandum of April 11, 1989, indicates that AMCCOM was trying to confirm the date from which to start counting the 29–month delivery schedule.

Another AMCCOM official, in an internal memorandum dated April 14, 1989, stated that Egypt's signature on Amendment 1 to Case EG–B–UHO constituted Egypt's agreement to have AMCCOM purchase the LRFs and BCSs from plaintiff with a delivery lead time of 29 months from August, 25 1988, the date of implementation of the amendment, or by January 25, 1991. The memorandum did not mention the request by Egypt that delivery occur within 20 months, nor AMCCOM's assurances to Egypt that it would make every effort to effectuate delivery within 20 months—by April 1990.

On April 14, 1989, AMCCOM prepared an "INFORMATION PAPER" that included a "Listing of Events and Dates of Completion" for the Egyptian FMS case. The estimated date for award of the contract was March 28, 1990. AMCCOM contemplated that prior to award of the contract AMCCOM would receive an approved J & A, issue a solicitation, receive a proposal, obtain a DCAA audit, and conduct negotiations.

On April 18, 1989, plaintiff met with Major General Brailsford and another AMC-COM official. Plaintiff confirmed that it was still seeking DCAS in-process inspection. Defendant accepts plaintiff's assertion that plaintiff " 'again told AMCCOM that it was continuing production to avoid a break in its production line so that the expedited delivery schedule could be met and to reduce the cost of the hardware to the customer.' " Def's Proposed Findings of Uncontroverted Fact No. 18(e), filed Dec. 11, 1991. Defendant also accepts

plaintiff's allegation that Major General Brailsford "stated 'that he would make the FMS case a priority and that he would move the procurement along as fast as he could,' 'that Kollsman could be under contract within 30 days,' and that 'he could not execute a letter of intent under advice of counsel.'" *Id.* No. 18(g). Plaintiff asserts that Major General Brailsford decided not to sign the letter of intent because he believed that a formal contract would be awarded before a letter of intent could be processed. This assertion is not supported in the record.

With respect to the April 18, 1989 meeting, defendant advances the following based on an April 29, 1989 government Memorandum for Record and an interrogatory response: (1) No government representative requested at the meeting that plaintiff continue production to avoid a break in its production line; (2) plaintiff stated at the meeting that it had been producing LRFs and BCSs for the Egyptian FMS case at its own risk; and (3) plaintiff stated at the meeting that it was unaware of the March 30, 1989 letter withdrawing plaintiff's request for in-process inspection and that it had been sent in error. Plaintiff disputes these assertions and contends the following: (1) Further discovery is needed to determine whether the Government requested plaintiff to continue production; (2) the document relied on by defendant to assert that plaintiff had accepted the risk for producing the LRFs and BCSs merely suggests that the Government author of the document believed that plaintiff had been producing the LRFs and BCSs at its own risk; and (3) the error discussed by plaintiff at the meeting, with respect to in-process inspection, was that the withdrawal letter claimed incorrectly that plaintiff no longer desired DCAS in-process inspection, not that the withdrawal letter itself had been submitted in error—that is, plaintiff intended through the withdrawal letter to retract the offer of "No Liability On Government," not the request for in-process inspection. The third point is substantiated by the declarations of Messrs. Domini and Richmond.

Plaintiff professes that on or about April 18, 1989, AMCCOM advised plaintiff that "it would 'need to push' the procurement process and that it did not intend to 'do business as usual.'" Plf's Proposed Findings of Uncontroverted Fact No. 41, filed Jan. 10, 1992. This assertion is discounted since plaintiff relies on a government memorandum bereft of any indication of communication with plaintiff.

On April 27, 1989, plaintiff attended several meetings at AMCCOM. Plaintiff responded to an interrogatory querying every statement made at the AMCCOM meeting, referenced in its complaint, with the following:

"Col. George stated that using the FAITE II equipment for the Egyptian buy was 'no problem.' He also stated that his legal department was working on the in-process inspection issue. Col. George also told Kollsman that certain technical specifications for the units being produced for Egypt by Kollsman may have to be changed subsequently and that Kollsman would not be allowed to charge the government for any teardown and rebuild of those units inspected by DCAS and tested with the FAITE II equipment. In other words, Col. George advised Kollsman that it was at risk for the teardown and rebuild costs if it continued with production in advance of receiving a formal, written contract. Mr. Colledge stated that the J & A process was proceeding and that use of the FAITE II equipment for the Egyptian buy was affirmative."

Def's Proposed Findings of Uncontroverted Fact No. 19, filed Dec. 11, 1991.

On May 2, 1989, plaintiff telephonically confirmed to AMCCOM that plaintiff was still seeking authority for both in-process inspection and pre-contract costs.

On May 4, 1989, Contracting Officer Warren prepared for the Egyptian FMS case a document entitled "Listing of Events and Actual/Estimated Dates of Completion (Accelerated Schedule)." The document listed estimated dates beyond May 4, 1989, for the occurrence of final approval of the J & A (May 12); issuance

of the RFP (June 2); receipt of the DCAA audit (September 22); receipt of the technical evaluation and review by AMCCOM (September 22); completion of negotiations (October 30); and award of contract (November 30). Plaintiff specifically disputes that each of these events, except for completion of negotiations and award of contract, had not occurred by May 4, 1989. Plaintiff contends that additional discovery is needed to determine the actual dates on which the events occurred. Plaintiff acknowledges that AMCCOM had not awarded a written contract by May 4, 1989, but plaintiff disputes that this fact suggests that AMCCOM had not completed negotiations or awarded an implied-in-fact contract to plaintiff by that date.

Plaintiff contends: "On May 5, 1989, AMCCOM determined that DCAS had been performing inspection services for the LRFs and BCSs manufactured by Kollsman for the Egyptian procurement. Thus, on May 8, 1989, AMCCOM informed Kollsman that DCAS might be able to continue its inspection services without a formal AMCCOM position." [Citations omitted.] Plf's Proposed Findings of Uncontroverted Fact, No. 45, filed Jan. 10, 1992. To substantiate this claim, plaintiff points to a government Conversation Record and an Activity Report of plaintiff, both ostensibly addressing the same events. While germane, neither makes any statements that could generate the poetic license of plaintiff's proposed finding.

On May 12, 1989, AMCCOM responded to Mr. Richmond's letter of April 7, 1989, in which plaintiff requested authorization from AMCCOM for several matters relating to the Egyptian FMS case. AMCCOM stated:

The Justification and Approval document required is being expedited, as you know, and [is] expected immediately. ... By letter dated March 14, 1989, TACOM has authorized the use of ...

FAITE II by Kollsman on a non-interference and rental basis....[7]

The request to recognize precontract costs is not felt appropriate as the subsequent contract will be negotiated and all allowable/allocable costs will be recognized.

Your request to have in-process inspection continued is still being pursued. Once review of the technical requirements has been completed and legally reviewed, a final determination can be made.

On May 16, 1989, AMCCOM advised plaintiff that DCAS would continue its inspection services although AMCCOM had not taken a formal position. Also on May 16, 1989, J.R. Sculley, Assistant Secretary of the Army (Research, Development and Acquisition), approved the J & A for award of a sole-source contract to plaintiff.

On June 7, 1989, AMCCOM provided assistance in obtaining the release to plaintiff of electronic components, confiscated by the United States Customs Service ("Customs"), that were needed by plaintiff for the manufacture of the LRFs for the Egyptian FMS Case. AMCCOM provided the assistance through a letter in which it stated that AMCCOM expected to issue the solicitation for the LRFs for the Egyptian FMS case to plaintiff on or about June 16, 1989, and expected to award the contract for the LRFs to plaintiff in November 1989. Additionally, AMCCOM stated that "[i]n order to not have a break in production, Kollsman has accepted full responsibility and is continuing to produce the LRF ... pending the receipt of a DOD contract...." Plaintiff disputes that it had accepted any responsibility for production of the LRFs and BCSs.

On June 7, 1989, AMCCOM issued Solicitation DAAA09–89–R–0793, a sole source procurement RFP, to plaintiff for 140 LRFs and 170 BCSs for the Egyptian FMS

7. The court notes that it did not glean from its reading of the March 14, 1989 letter that TACOM had authorized plaintiff to use the FAITE II equipment for the Egyptian FMS case. TACOM's letter was in response to a request from plaintiff to use the equipment for several purposes. While TACOM in its letter authorized use of the equipment on a non-interference basis, subject to certain conditions, it also stated that it could not address plaintiff's request to use the equipment for the Egyptian FMS case.

case. The RFP stated: "The Government contemplates award of a FIRM FIXED PRICE contract resulting from this solicitation." The RFP required plaintiff to submit its proposal by July 14, 1989.

On June 12, 1989, AMCCOM sent a letter to plaintiff stating:

As you have by now received our Request for Proposal (RFP), I'm sure you realize the Justification and Approval (J & A) has been approved.

Upon receipt of your proposal, we should be able to review, negotiate and complete contract award in a minimum of time. We look forward to a successful completion and delivery of hardware.

On June 15, 1989, plaintiff submitted two alternate proposals in response to the RFP. The first proposal called for providing LRFs and BCSs produced in accordance with the certified government TDP, and the second proposal called for providing LRFs and BCSs produced in accordance with the configuration used by plaintiff on the TACOM Contract. Plaintiff's second proposal included requests for waiver (RFWs) of certain TDP requirements. Contracting Officer Warren, in a memo to AMCCOM, stated that each RFW would be reviewed by the Configuration Control Board before being approved. Three RFWs were rejected on or about August 21, 1989.

In June 1989 Optic–Electronic Corp. filed a protest with the United States Government Accounting Office ("GAO"), challenging the lack of competitive procurement on Solicitation DAAA09–89–R–0793. GAO denied the protest on October 6, 1989.

On July 27, 1989, Contracting Officer Warren in an internal memorandum relating to Solicitation DAAA09–89–R–0793, stated: "With the assurance of a DMS [Direct Military Sale], Kollsman began to produce the LRF and SSC [BCS]. To date, they have completed approximately eighty (80) percent of this Egyptian requirement. However, somewhere down the line, the DMS was changed to Foreign Military Sale (FMS)." Plaintiff takes the position, relying on its own internal memorandum, that 92 percent was completed by the end of August.

A memorandum to the USASAC Commander, approved by Contracting Officer Warren on August 16, 1989, stated that the LRFs and BCSs for the Egyptian FMS case "are going on contract, estimated on or about the end of Nov 89." The memorandum also stated: "Unless otherwise advised, contract award will proceed as planned."

At some point in August 1989, Egypt requested a list of the items for the Egyptian FMS case that could be cancelled without cancellation charges and the impact and cancellation costs for items already under contract. In response to this request, on August 29, 1989, the USASAC Commander asked that Egypt provide a list of the items that it was not considering for cancellation and noted that he had been advised on August 23, 1989, that priority items for cancellation included the LRFs and BCSs.

On September 6, 1989, AMCCOM was incorrectly notified that Egypt had deleted the LRFs and BCSs from the Egyptian FMS case. On that same date, AMCCOM sent a letter to plaintiff, notifying plaintiff that Egypt deleted the LRFs and BCSs from the Egyptian FMS case and that Solicitation DAAA09–89–R–0793 would be cancelled. In a letter to Contracting Officer Warren, dated September 8, 1989, Mr. Richmond stated:

Kollsman hereby acknowledges receipt of AMCCOM's letter ... dated 6 September 1989. This letter hereby confirms our telephone conversations of 7 September 1989 wherein we advised that Kollsman's investigation of the basis for cancellation of subject solicitation does not appear to be valid.

It is our understanding that Egypt had requested status of FMS case EG–B–UHO relative to implementation status of over 130 line items, of which the 140 LRFs and 170 BC[S]s to be supplied by Kollsman are two such line items. Since it appears that Egypt is simply requesting information from the U.S. Government and upon receipt of that information any further action, such as cancellation or modification, is subject to MOD

review in Egypt, your RFP and contract in-process should proceed.

In addition, I confirmed our Mr. Charles Hugo's information to your Command that should there be a cancellation of this requirement the impact on Kollsman would be substantial and that AMC-COM should so advise the Egyptian government that they will incur substantial termination costs.

An internal AMCCOM memorandum, prepared on September 12, 1989, stated that the requirement for LRFs and BCSs for the Egyptian FMS case was still valid and that the "[p]rocurement action should continue up to point of award, pending a decision by the Government of Egypt as to whether these items should be canceled from subject case." On September 15, 1989, Contracting Officer Warren sent a letter to plaintiff, rescinding the letter of September 6, 1989. The letter stated:

Subsequent clarification guidance issued by USASAC indicated that the intent of the message from the U.S. Embassy in Cairo, Egypt was to determine the feasibility of canceling selected items in the aforementioned FMS case [the Egyptian FMS case].

Since the requirement is now only being considered for cancellation my letter of September 6, 1989 is hereby rescinded and the requirement will continue to be processed to the point of award.

On September 25, 1989, USASAC sent a letter to the Egyptian government, stating:

Because contract award is expected within the next two weeks for EG–B–UHO line items 2 and 3 [the LRFs and BCSs], recommend a decision on cancellation be provided by your Government as soon as possible before 5 Oct 1989. If contracts are awarded, the estimated cancellation charges for these two lines will increase substantially. Additionally, Kollsman has indicated that they have responded in good faith to Egypt's sole source requirements and are concerned now that cancellation discussions are taking place. They have advised that all of their efforts to date were made so as to be in a position to start deliveries under EG–B–UHO line items 2 and 3 almost immediately after letting of the contract.

On October 10, 1989, plaintiff sent a letter to AMCCOM, regarding *"NOTICE OF POTENTIAL TERMINATION COSTS CLAIM."* The letter stated the following:

As the Army is aware, Kollsman has been expediting manufacture of the Laser Range Finders ... and the Ballistic Computer Systems ... for the Fire Control Systems identified under the ... [Egyptian] FMS Case in order to meet the user Government's [EGYPT] schedule requirements....

In order to fulfill our responsibility to mitigate any damage or injury to the U.S. Government, we feel obliged to inform the Government that Kollsman deems its performance to have been undertaken in good faith reliance upon the mutual efforts of the Army and Kollsman to meet the Egyptian Government's requirements. Therefore, we request that the Army include the potential for Kollsman's claim for termination costs in addition to any costs which the U.S. Government may have incurred in any notice to the FMS Customer of estimated Termination or Cancellation Costs associated with any action ... Egyptian Government may take under the LOA.

Egypt sent a facsimile transmission to USASAC, dated October 16, 1989, deleting the LRFs and BCSs from the Egyptian FMS case. According to an internal government record of an October 19, 1989 telephone call, AMCCOM was continuing procurement, despite having received the notice of cancellation from Egypt. On November 13, 1989, USASAC instructed AMCCOM to cancel the LRFs and BCSs for the Egyptian FMS case. On November 21, 1989, AMCCOM wrote plaintiff that the requirements for LRFs and BCSs for the Egyptian FMS case had been cancelled and that Solicitation DAAA09–89–R–0793 was "withdrawn and cancelled in its entirety." AMCCOM formally withdrew the solicitation on January 31, 1990.

On November 29, 1989, AMCCOM responded to plaintiff's October 10, 1989 letter that gave notice of a potential claim

with respect to the LRFs and BCSs. AMC-COM stated:

> Kollsman is hereby advised that the U.S. Government considers this potential claim to be without merit. Also, Kollsman is reminded that the U.S. Government has consistently and repeatedly advised Kollsman that any action taken by Kollsman regarding the requirements on FMS Case No. EG–B–UHO, prior to an award of any contract, was being done at Kollsman's own risk. This position has not changed.

On March 21, 1990, plaintiff submitted a claim to the procuring contracting officer for $14,417,888.00. Plaintiff stated that it was requesting "reimbursement reflecting its costs and reasonable profit relating to its performance on an implied contract in support of an anticipated sole-source award of RFP DAA[A]09–89–R–0793 from the U.S. Army Armament[,] Munitions and Chemical Command (AMCCOM) for 140 Laser Range Finder AN/VVG–2 Systems and 170 Ballistic Computer Systems." The contracting officer issued a final decision denying the claim in its entirety on August 21, 1990. Plaintiff has sued for the full amount of its claim.

In addition to the specific facts discussed above, plaintiff asserts, through the declarations of Messrs. Domini and Richmond, the following general facts: (1) Plaintiff believed, based on assurances by AMC-COM, that AMCCOM had committed itself to reimburse plaintiff for its production of the LRFs and BCSs; (2) plaintiff would not have been able to comply with the delivery schedule agreed to by the Government without pre-award production; (3) government officials never told plaintiff not to attempt to comply with the delivery schedule or to discontinue production; (4) plaintiff never believed or informed AMCCOM that plaintiff had accepted the risk that it would receive no payment for its pre-award production costs; and (5) government officials never told plaintiff that it would not be reimbursed for its pre-award production.

## DISCUSSION

Plaintiff, in its complaint, alleges that an implied-in-fact contract for the Egyptian FMS case resulted during the course of dealings between itself and the Government. Defendant moves for summary judgment on the basis that plaintiff cannot prove facts establishing an implied-in-fact contract.

### 1. *Summary judgment standards*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Defendant, as the moving party, has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553. The Supreme Court has explained that a nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *Id.* at 324, 106 S.Ct. at 2553. However, the proofs must be of a type that would be accepted as evidence at trial. *Cf. Cedar Lumber, Inc. v. United States*, 857 F.2d 765, 769 (Fed. Cir.1988) (admissibility need not be demonstrated, but court must disregard evidence that would not be admissible at trial). Moreover, evidence that is not significantly probative will not overcome a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citing *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)); *see* Fed.R.Evid. 403.

> To create a genuine issue of fact, the nonmovant must do more than present *some* evidence on an issue it asserts is disputed. The [Supreme] Court stated:
>
>> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the

evidence [of the nonmovant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988) (emphasis in original) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In resolving defendant's motion, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2513. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984).

█ Plaintiff had the right, pursuant to RUSCC 56(g), to submit an affidavit detailing why it needed to conduct discovery in order to oppose defendant's motion.[8] *Dunkin' Donuts of America, Inc. v. Metallurgical Exoprods. Corp.*, 840 F.2d 917, 919 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1566–67 (Fed.Cir.1987). In response to defendant's proposed findings, plaintiff repeatedly denied the factual assertions and claimed that discovery was required to rebut them. Since, in most instances, defendant was

relying on recollections of plaintiff's own personnel given in response to interrogatories, plaintiff's claim that it required discovery is mystifying. This is especially true because the facts that defendant seeks to establish are that at the September 20, 1988 meeting, no government representative requested that plaintiff maintain its then-current production line or that plaintiff produce the LRFs and BCSs for the Egyptian FMS case; that at the November 8, 1988 meeting, no government representative requested that plaintiff continue production of the LRFs and BCSs or that plaintiff order long-lead material; and that at the April 18, 1989 meeting, no government representative requested that plaintiff continue production in order to avoid a break in its production line (plaintiff having responded to interrogatories with other statements that government representatives allegedly did make at these meetings).

The opponent of a summary judgment motion cannot fail to disclose the evidentiary basis for its claims. *Crawford v. United States*, 3 Cl.Ct. 323, 328–29 (1983) (citing cases), *aff'd*, 732 F.2d 168 (Fed.Cir.) (Table), *cert. denied*, 469 U.S. 861, 105 S.Ct. 194, 83 L.Ed.2d 127 (1984). Plaintiff did not require discovery of defendant to determine whether statements were made to plaintiff. In any event, plaintiff failed to invoke the procedures of Rule 56(g), and it is too late to do so now that briefing is completed. "Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." *Pure Gold*, 739 F.2d at 627 (citation omitted). Although the court denies the motion, defendant is entitled to findings of fact with respect to matters that are not in substantial controversy. RUSCC 56(e).

---

8. By order of September 20, 1991, the court stayed deposition discovery at the parties' request until the court ruled on defendant's forthcoming motion for summary judgment pursuant to RUSCC 12(i). During argument plaintiff's counsel claimed that plaintiff had foresworn discovery due to the order suspending discovery. RUSCC 12(i) and 56(g) are complementary: The former allows for a stay of discovery pending the filing of a dispositive motion for good cause shown in order to conserve resources by staying discovery of all matters raised by the complaint; the latter allows for focused discovery to meet a summary judgment motion. The summary judgment procedure would be meaningless if a party could oppose a motion by the blanket claim of a need for discovery. *See New America Shipbuilders, Inc. v. United States*, 871 F.2d 1077, 1081 (Fed.Cir. 1989) (an opponent must demonstrate the need for discovery or the court properly may stay discovery once the motion has been filed).

## 2. Implied-in-fact contract

■ To establish the existence of an implied-in-fact contract at trial, plaintiff would need to prove "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985) (citing cases). "Mutuality is inferred 'from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Sperry Corp. v. United States*, 13 Cl.Ct. 453, 458 (1987) (quoting *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426–27, 67 L.Ed. 816 (1923)).

■ "An offer must be unambiguous, and acceptance must be manifested unambiguously by conduct that indicates assent...." *Sperry*, 13 Cl.Ct. at 458 (citing cases). Inducement or encouragement to do work may constitute the conduct that indicates acceptance. *See id.* Government acceptance of services without disclaiming an intention to pay after demand for payment is made supports an implied-in-fact contract. *See Pacific Maritime Ass'n v. United States*, 123 Ct.Cl. 667, 675–76, 108 F.Supp. 603, 607 (1952); *Sperry*, 13 Cl.Ct. at 458; *Johnson Controls, Inc. v. United States*, 8 Cl.Ct. 359, 368–69 (1985), *aff'd*, 795 F.2d 1011 (Fed.Cir.1986) (Table).

With respect to the evidence generally required to support an implied-in-fact contract, the Court of Claims stated:

A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.

*Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977) (footnotes omitted).

Defendant argues that plaintiff cannot establish either authority of a government official to contract with plaintiff or mutuality of intent to contract.

## 3. Authority to bind the Government

■ According to defendant, no AMC-COM official had authority to bind the Government to a contract with plaintiff prior to May 16, 1989, the date of approval of the J & A. Defendant argues that 10 U.S.C. § 2304 (1988), and 48 C.F.R. § 6.304(a)(4) (1989), mandated that J & A approval be obtained prior to award of a sole source contract.[9]

10 U.S.C. § 2304 provides, in pertinent part:

§ 2304. Contracts: competition requirements

(c) The head of an agency may use procedures other than competitive procedures only when—

. . . .

(4) the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures;

. . . .

(f)(1) ... the head of an agency may not award a contract using procedures other then competitive procedures unless—

(A) the contracting officer for the contract justifies the use of such procedures

---

9. The court's discussion of the relevant statute and regulations with respect to the J & A pertains to the statute and regulations as they exist-ed at the time J & A approval was obtained, not as they currently exist.

in writing and certifies the accuracy and completeness of the justification;

(B) the justification is approved—

....

(iii) in the case of a contract for an amount exceeding $10,000,000, by the senior procurement executive of the agency designated pursuant to section 16(3) of the Office of Federal Procurement Policy Act ... or in the case of the Under Secretary of Defense for Acquisition, acting in his capacity as the senior procurement executive for the Department of Defense, the Under Secretary's delegate designated pursuant to paragraph (6)(B)....

48 C.F.R. § 6.304(a)(4) provides, in pertinent part:

**6.304 Approval of the justification.**

(a) ... the justification for other than full and open competition shall be approved in writing—

....

(4) For a proposed contract over $10,000,000, by the senior procurement executive of the agency designated pursuant to the OFPP Act (41 U.S.C. 414(3)) in accordance with agency procedures. Except as provided in 10 U.S.C. 2304(f)(1)(B)(iii), which applies to the Department of Defense, this authority is not delegable.

The statute and regulation establish that justification and approval are required for a noncompetitive procurement, such as the sole source procurement at issue. Plaintiff does not dispute the existence of the requirement, but argues that the requirement is merely a *"pro forma"* procedure. *See Penn–Ohio Steel Corp. v. United States,* 173 Ct.Cl. 1064, 1085–86, 354 F.2d 254, 267 (1965) (binding agreement recognized when authorized official was apprised of all essential elements of agreement and granted oral approval thereto, subject only to his later *pro forma* approval of its terms and conditions). Plaintiff argues that a

contracting officer has authority to enter into a sole source contract upon receipt of a sole source procurement request from an FMS customer. According to plaintiff, 10 U.S.C. § 2304(c)(4) and 48 C.F.R. § 6.302–4 (1985), exempt FMS procurement from competition requirements for government contracts and 48 C.F.R. § 225.7307(a) (1986), establishes that the FMS customer confers contracting authority on a contracting officer.

Plaintiff's argument is without merit. 48 C.F.R. § 225.7307(a) provides:

(a) Purchases for FMS customers shall be implemented under normal acquisition and contract management procedures set forth in the FAR and this supplement, and other directives. However, the FMS customer may request that a defense article or defense service be obtained from a particular prime source. In such cases, FAR 6.302–4 provides authority to contract without full-and-open competition. The FMS customer may also request that a subcontract be placed with a particular firm. The contracting officer shall honor such requests from the FMS customer only as specified in the Letter of Agreement or other written direction by the military sales organization.

This regulation establishes that the authority to enter FMS sole source contracts derives from 48 C.F.R. § 6.302–4. Section 6.302–4 derives its authority from 10 U.S.C. § 2304(c)(4) and provides that contracts awarded under its authority "shall be supported by written justifications and approvals described in 6.303 and 6.304." Thus, 48 C.F.R. § 225.7307(a) requires conformance to the J & A requirement of 10 U.S.C. § 2304(c)(4) and 48 C.F.R. § 6.304.[10]

■ AMCCOM could not bind itself to a contract with plaintiff prior to its fulfilling the procedural requirement of a J & A. *See New America Shipbuilders,* 871 F.2d at 1080; *Empresas Electronicas Walser,*

---

**10.** Plaintiff also offers as support for its assertion that the J & A requirement is a *"pro forma"* procedure the fact that the above statute and regulations have been amended, subsequent to approval of the J & A at issue in this case, and no longer require that a formal J & A be obtained for a sole source contract awarded by the Department of Defense. This matter is not relevant to the issue of whether a J & A was required for the Egyptian FMS case. *See supra* note 9.

*Inc. v. United States,* 223 Ct.Cl. 686, 688, 650 F.2d 286 (Table), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 217 (1980). Plaintiff had notice that AMCCOM considered express execution of a J & A to be a requirement to enter into a formal written contract with plaintiff. Although no authority to contract existed prior to May 16, 1989, the date on which the J & A was executed formally, the lack of a J & A does not defeat plaintiff's claim based on an implied-in-fact contract to produce the military hardware in order to meet AMCCOM's schedule *i.e.,* to pay plaintiff for its pre-contract costs. *See OAO Corp. v. United States,* 17 Cl.Ct. 91 (1989) (recognizing implied-in-fact contract for start-up costs when commencement of performance required prior to formal contract award to meet government deadline); *Sperry,* 13 Cl. Ct. 453 (summary judgment for implied-in-fact contract to pay for costs of accelerated production denied when Government accelerated delivery schedules).

### 4. *Mutuality of intent*

■ Defendant contends that plaintiff cannot establish mutuality of intent to contract because the facts of record establish that AMCCOM contemplated fulfilling the formal requirements for a written contract. The case law eschews the existence of an implied-in-fact contract when the parties expressly contemplate entering into a written agreement. *DeMatteo Constr. Co. v. United States,* 220 Ct.Cl. 579, 585–86, 600 F.2d 1384, 1388 (1979); *American Gen. Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 373, 587 F.2d 54, 58 (1978); *Ship Constr. & Trading Co. v. United States,* 91 Ct.Cl. 419, 456 (1940), *cert. denied,* 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941); *Pacific Gas & Elec. Co. v. United States,* 3 Cl.Ct. 329, 339 (1983), *aff'd,* 738 F.2d 452 (Fed.Cir.1984) (Table). Defendant has established, without quarrel, that at all times the parties anticipated entering into a written contract. Indeed, AMCCOM specifically declined Mr. Richmond's request for an undertaking to reimburse plaintiff because

price negotiations were contemplated in conjunction with issuance of the written contract.

Once again, however, the consequence is not as draconian as defendant urges. Because of the rule disallowing contracts implied-in-fact when a written agreement is the subject of the parties' understanding, plaintiff may not be able to prove an implied-in-fact contract that is tantamount to the written contract that was anticipated, but plaintiff has interjected a genuine issue as to whether AMCCOM viewed itself as responsible for the deadline that plaintiff was attempting to meet. For purposes of summary judgment, the court must accept plaintiff's assertion that pre-award production was necessary in order to meet Egypt's delivery schedule agreed to by AMCCOM. However, the court notes that the facts at present are unclear as to whether a 20–month or a 29–month delivery schedule was required and as to whether pre-award production actually was necessary to meet the delivery schedule agreed to by AMCCOM.

Plaintiff has demonstrated that AMCCOM officials contemplated that plaintiff would be paid for its production costs in connection with the negotiations that were to occur prior to the issuance of a formal contract. AMCCOM's letter of May 12, 1989 states: "The request to recognize pre-contract costs is not felt appropriate as the subsequent contract will be negotiated and all allowable/allocable costs will be recognized." However, the contractor's demand[11] for payment acknowledged that plaintiff "at its own risk proceeded to buy materials in anticipation of the resultant contract," per Mr. Richmond's April 7, 1989 letter.

In his declaration, Mr. Richmond states:

At no time did Kollsman believe, or inform AMCCOM, that Kollsman had accepted the risk that it would receive no payment for its pre-award production costs. Rather, Kollsman accepted, and

---

11. Mr. Richmond framed his demand, as follows: "I would appreciate receiving an advance agreement that would recognize that the costs

currently being incurred would be allowable as pre-contract costs."

relayed its acceptance to AMCCOM, the risk that it would not receive prompt payment for its efforts. Statements concerning acceptance of risk by Kollsman refer to the acceptance of the risk of unprompt payment. Declaration of Charles F. Richmond, Jan. 7, 1992, ¶ 8. Mr. Domini's declaration is to like effect. Declaration of Robert Domini, Jan. 7, 1992, ¶ 10. At argument plaintiff's counsel contended that Mr. Richmond's declaration correctly identified the precise nature of the risk borne by plaintiff since AMCCOM's May 12 letter acknowledged that the costs plaintiff had incurred would be paid at a later date. This position is disingenuous; plaintiff in response to defendant's proposed findings admitted that plaintiff at its own risk purchased some materials in anticipation of a formal contract. Plf's Statement of Genuine Issues No. 15, filed Jan. 10, 1992.

 A party cannot defeat summary judgment by instigating controversy with its own position on the facts. *Sohm v. United States*, 3 Cl.Ct. 74, 77–78 (1983). Serving as Vice President, Marketing, Mr. Richmond was in a position to bind plaintiff to his unequivocal statement in the April 7 letter concerning plaintiff's assumption of risk. The documents of record disclose that plaintiff was as anxious as AMCCOM, if not more so, to expedite production and to avoid a break in production. Although plaintiff may have viewed an eventual sole source contract as a "sure thing," or "done deal," as counsel for plaintiff stated in argument, the law does not entitle plaintiff to project its view on the Government. Allowing plaintiff to proceed on an implied-in-fact contract for pre-contract costs, however, is not inconsistent with plaintiff's agreeing voluntarily to assume some risk in view of the substantial business that the procurement garnered for plaintiff. Plaintiff indisputably assumed the risk of buying materials in anticipation of the forthcoming contract. Trial will resolve the identification, quantification, and costs of those materials.

Defendant is also entitled to a finding that no government representative at the crucial September 20, 1988 and November 8, 1988 meetings made assurances that plaintiff would be reimbursed for its production of the LRFs and BCSs. Defendant submitted interrogatories to plaintiff asking for the particulars of all statements by government representatives at these meetings. Plaintiff responded based on the recollection of attendees at the meeting as to what was said; plaintiff related no recollections tantamount to assurances of reimbursement. Plaintiff submitted the declarations of Messrs. Domini and Richmond, one of whom attended each meeting. Neither does more than state that "Kollsman believed, based on assurances made by AMCCOM, that AMCCOM had committed itself to reimburse Kollsman for its production of the LRF and BCS." Domini Decl. ¶ 5; Richmond Decl. ¶ 3. The authorities cited above command a ruling that this meager showing is insufficient to create substantial controversy on point. Plaintiff has had several opportunities to particularize its allegations. The vague and conclusionary statements proffered by plaintiff's declarants are not "significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

The thrust of the Domini and Richmond declarations is that AMCCOM bound itself to contract by not making certain statements or taking certain actions, *e.g.*, failing to direct plaintiff not to attempt to comply with the delivery schedule or to discontinue production, failing to tell plaintiff that it would not be reimbursed for its pre-award production, failing to indicate to plaintiff that its pre-award production was being conducted solely at its risk. Richmond Decl. ¶¶ 6–7, 9; Domini Decl. ¶¶ 8–10. If plaintiff's proof adds no more, trial will not benefit its case.

## CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

Pursuant to RUSCC 56(e), the facts, in the body of this opinion that have not been controverted, excluding facts that defendant conceded only for purposes of summary judgment, appear without substantial

controversy and are deemed established for the purposes of trial.[12] In addition, there is no substantial controversy that a Justification and Approval was required for the plenary contract and that matter shall also be deemed established for trial. Whether there was mutuality of intent to contract is a material fact actually and in good faith controverted and must be resolved at trial. Defendant's motion is denied in all other respects. A scheduling order has been entered separately.

---

**12.** At argument plaintiff's counsel was concerned about the scope of plaintiff's inquiry at deposition. Plaintiff's failure to meet defendant's motion precludes it from inquiring of government representatives at the September 20, 1988 meeting whether the Government requested plaintiff to maintain its production line or produce the LRFs and BCSs for the Egyptian FMS case; at the November 8, 1988 meeting whether the Government requested that plaintiff continue production of the LRFs and BCSs or that plaintiff order long-lead material; and at the April 18, 1989 meeting whether Major General Brailsford requested plaintiff to continue production in order to avoid a break in its production line.